168 U.S. 532 (1897)
BRAM
v.
UNITED STATES.
No. 840.
Supreme Court of United States.
Argued October 18, 19, 1897.
Decided December 18, 1897.
ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.
*534 Mr. Asa P. French and Mr. James E. Cotter for plaintiff in error.
Mr. Assistant Attorney General Boyd for defendants in error. Mr. Solicitor General was on his brief.
MR. JUSTICE WHITE delivered the opinion of the court.
This writ of error is prosecuted to a verdict and sentence thereon, by which the plaintiff was found guilty of murder, and condemned to suffer death. The homicide was committed on board the American ship Herbert Fuller while on the high seas bound from Boston to a port in South America. The accused was the first officer of the ship, and the deceased, of whose murder he was convicted, was the master of the vessel. The bill of exceptions, after stating the sailing of the vessel from Boston on the 2d of July, 1896, with a cargo of lumber, gives a general summary of the facts leading up to and surrounding the homicide as follows:
"She had on board a captain, Charles I. Nash; Bram, the defendant; a second mate, August W. Blomberg; a steward, and six seamen; also the captain's wife, Laura A. Nash, and one passenger, Lester H. Monks.
"The vessel proceeded on her course toward her port of destination until the night between July 13 and July 14. On that night at 12 o'clock the second mate's watch was relieved by the mate's watch, of which Bram, the defendant, was *535 the officer in charge. The captain, his wife, the passenger Monks and the first mate and the second mate, all lived in the aftercabin, occupying separate rooms... . The crew and the steward slept forward in the forward house.
"When the watch was changed at midnight, Bram, the defendant, took the deck, the seamen Loheac and Perdok went forward on the lookout, and Charles Brown, otherwise called Justus Leopold Westerberg, his true name, took the wheel, where it was his duty to remain till two o'clock, at about which time he was relieved by Loheac. The second mate went to his room and the seamen of his watch to their quarters at twelve midnight, and there was no evidence that any of them or the steward appeared again till daylight.
"The passenger Monks, who occupied a room on the starboard side of the cabin, between the chart room where the captain slept and the room on the forward starboard side where Mrs. Nash slept, with doors opening from the passenger's room into both the chart room used by the captain as his room and that of Mrs. Nash, was aroused not far from two o'clock  the exact time is not known, as he says  by a scream, and by another sound characterized by him as a gurgling sound. He arose, went to the captain's room, and found the captain's cot overturned and the captain lying on the floor by it. He spoke, but got no answer; put his hand on the captain's body and found it damp or wet. He then went to Mrs. Nash's room, did not see her, but saw dark spots on her bedding, and suspected something wrong. He went on deck and called the mate, the defendant, telling him the captain was killed. Both went below, took down the lantern hanging in the main cabin, burning dimly, turned it up and went through the captain's room to the passenger's room, and the passenger there put on a shirt and pantaloons. They then both returned to the deck, the mate on the way stopping a brief time in his own room. Bram and Monks remained talking on deck till about daybreak, when the steward was called and told what had happened. Up to this time no call had been made for the second mate, nor had any one visited his room. Later it was found that Captain Nash, his wife and *536 Blomberg, the second mate, were all dead, each with several wounds upon the head, apparently given with a sharp instrument like an axe, penetrating the skull and into the substance of the brain, and the second mate lying on his back with his feet crossed, in his berth; Mrs. Nash in her bed, in her room, and at the back side of the bed, and Captain Nash in his room, as already stated.
"The whole crew was called at or about daylight and were informed of the deaths.
"The bodies were removed from the cabin and placed in the jolly boat, and the boat was towed astern to Halifax. The cabin was then locked, Bram taking the keys, and it remained locked till the vessel reached Halifax.
"At first, after the discovery of the murders, there was some hesitancy as to where the vessel should go. At the defendant's suggestion she was headed to go to Cayenne in French Guiana, but the plan was changed and she steered for Halifax, Nova Scotia, where she arrived July 21, and was taken possession of by the local authorities at the instance of the consul general of the United States.
"At first, after the discovery of the murders, Bram, on whom had devolved the command of the ship, made Brown chief mate and Loheac second mate.
"No blood or spots of blood were ever discovered on the person or the clothing of any person on board, nor did anything direct suspicion to any one.
"In a day or two, suspicion having been excited in respect to the seaman Brown, the crew, under the supervision of Bram, seized him, he not resisting, and put him in irons. All the while the officers and seamen remained on deck. Bram navigated the ship until Sunday before they reached Halifax on Tuesday, and after the land of Nova Scotia was in sight, when, Brown having stated to his shipmates, or some of them, that he saw into the cabin through a window in the afterpart and on the starboard side of the house, and saw Bram, the mate, kill the captain. In consequence of this statement of Brown, the crew, led by the steward, suddenly overpowered the mate and put him in irons, he making no resistance, but *537 declaring his innocence. Bram and Brown were both carried into Halifax in irons."
The bill of exceptions further states that when the ship arrived at Halifax the accused and Brown were held in custody by the chief of police at that place, and that whilst in such custody the accused was taken from prison to the office of a detective and there questioned under circumstances to be hereafter stated. Subsequently to this occurrence at Halifax, all the officers, the crew and the passenger were examined before the American consul and gave their statements, which were reduced to writing and sworn to. They were thereafter, at the request of the American consul, sent to Boston, where the accused was indicted for the murder of Nash, the captain, of Mrs. Nash, and the second mate Blomberg. The trial and the conviction, now under review, related to the first of these charges. The errors which are here assigned as grounds for reversal, are more than sixty in number, and are classified by the counsel for the accused as follows: (a) Questions raised preliminary to the trial. (b) Questions raised during the trial. (c) Questions raised in connection with two motions for a new trial.
We first examine the error relied on which seems to us deserving of the most serious consideration. During the trial, a detective by whom the accused was questioned whilst at Halifax was placed upon the stand as a witness for the prosecution for the purpose of testifying to the conversation had between himself and the accused at Halifax, at the time and place already stated. What took place between the accused and the detective at the time of the conversation, and what occurred when the witness was tendered in order to prove the confession, is thus stated in the bill of exceptions:
"Nicholas Power, of Halifax, called by the Government, testified that he was connected with the police department of Halifax, and had been for thirty-two years, and for the last fifteen years of that time as a detective officer; that after the arrival of the Herbert Fuller at Halifax, in consequence of a conversation with Charles Brown, he made an examination of Bram, the defendant, in the witness's office, in the city hall *538 at Halifax, when no one was present besides Bram and the witness. The witness testified that no threats were made in any way to Bram, nor any inducements held out to him.
"The witness was then asked: `What did you say to him and he to you?'
"To this the defendant's counsel objected. The defendant's counsel was permitted to cross-examine the witness before the court ruled upon the objection, and the witness stated that the conversation took place in his office, where he had caused the defendant Bram to be brought by a police officer; that up to that time the defendant had been in the custody of the police authorities of Halifax, in the custody of the superintendent of police, John O'Sullivan; that the witness asked that the defendant should be brought to his office for the purpose of interviewing him; that at his office he stripped the defendant and examined his clothing, but not his pockets; that he told the defendant to submit to an examination, and that he searched him; that the defendant was then in custody and did everything the witness directed him to do; that the witness was then a police officer acting in his official capacity; that all this took place before the defendant had been examined before the United States consul, and that the witness did not know that the local authorities had at that time taken any action, but that the defendant was held for the United States  for the consul general of the United States.
"The witness answered questions by the court as follows:
"You say there was no inducement to him in the way of promise or expectation of advantage?
"A. Not any, your honor.
"Q. Held out?
"A. Not any, your honor.
"Q. Nor anything said, in the way of suggestion to him that he might suffer if he did not  that it might be worse for him?
"A. No, sir; not any.
"Q. So far as you were concerned, it was entirely voluntary?
"A. Voluntary, indeed.
*539 "Q. No influence on your part exerted to persuade him one way or the other?
"A. None whatever, sir; none whatever.
"The defendant then renewed his objection to the question, what conversation had taken place between Bram and the witness, for the following reasons: That at the time the defendant was in the custody of the chief of police at Halifax; that the witness in an official capacity directed the police authorities to bring the defendant as a prisoner to his private office and there proceeded to take extraordinary liberties with him; he stripped him; the defendant understood that he was a prisoner, and he obeyed every order and direction that the witness gave. Under these circumstances the counsel submitted that no statement made by the defendant while so held in custody and his rights interfered with to the extent described was a free and voluntary statement, and no statement as made by him bearing upon this issue was competent.
"The objection was overruled, and the defendant excepted on all the grounds above stated, and the exceptions were allowed.
"The witness answered as follows:
"When Mr. Bram came into my office, I said to him: `Bram, we are trying to unravel this horrible mystery.' I said: `Your position is rather an awkward one. I have had Brown in this office and he made a statement that he saw you do the murder.' He said: `He could not have seen me; where was he?' I said: `He states he was at the wheel.' `Well,' he said, `he could not see me from there.' I said: `Now, look here, Bram, I am satisfied that you killed the captain from all I have heard from Mr. Brown. But,' I said, `some of us here think you could not have done all that crime alone. If you had an accomplice, you should say so, and not have the blame of this horrible crime on your own shoulders.' He said: `Well, I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it.' He was rather short in his replies.
"Q. Anything further said by either of you?
"A. No; there was nothing further said on that occasion.
*540 "The direct examination of this witness was limited to the interview between the witness and the defendant Bram.
"On cross-examination of the witness Power, he testified that at the time of the above-stated examination he took possession of a pair of suspenders belonging to the defendant, and kept the same in his office until the prisoners were coming to Boston  the whole crew and the passenger were imprisoned at Halifax, and sent as prisoners to Boston  when he handed them over to the Halifax superintendent of police, and they were sent to Boston, with other property of the defendant.
"Defendant's counsel, upon the ground of showing interest on the part of the witness, then asked: `What other articles belonging to the defendant did you take possession of at that time?'
"This line of inquiry was objected to by the District Attorney on the ground that the matter was not opened on the direct examination, and the defendant could call the witness as part of his case if he saw fit. The court excluded the inquiry, ruling that it was not proper cross-examination and did not tend to show interest, and the defendant duly excepted, and the exception was allowed."
The contention is that the foregoing conversation, between the detective and the accused, was competent only as a confession by him made; that it was offered as such, and that it was erroneously admitted, as it was not shown to have been voluntary. The question thus presented was manifestly covered by the exception which was taken at the trial. When it was proposed to examine the detective officer as to the conversation had by him with the accused, objection was duly made. The court thereupon allowed the officer to be examined and cross-examined as to the circumstances attending the conversation which it was proposed to offer as a confession. When this examination was concluded the accused renewed his objection, and his exception to the admissibility of the conversation was allowed and regularly noted. The witness then proceeded to give the conversation. To say that under these circumstances the objection which was twice presented *541 and regularly allowed should have been renewed at the termination of the testimony of the witness, would be pushing to an unreasonable length the salutary rule which requires that exceptions be taken at the trial to rulings which are considered erroneous, and the legality of which are thereafter to be questioned on error. There can be no doubt that the manner in which the exception was allowed and noted fully called attention to the fact that the admission of the conversation was objected to because it was not voluntary, and the overruling of this objection is the matter now assigned as error here. Indeed, in the argument at bar no contention was made as to the sufficiency and regularity of the exception. It is manifest that the sole ground upon which the proof of the conversation was tendered was that it was a confession, as this was the only conceivable hypothesis upon which it could have been legally admitted to the jury. It is also clear that in determining whether the proper foundation was laid for its admission, we are not concerned with how far the confession tended to prove guilt. Having been offered as a confession and being admissible only because of that fact, a consideration of the measure of proof which resulted from it does not arise in determining its admissibility. If found to have been illegally admitted, reversible error will result, since the prosecution cannot on the one hand offer evidence to prove guilt, and which by the very offer is vouched for as tending to that end, and on the other hand for the purpose of avoiding the consequences of the error, caused by its wrongful admission, be heard to assert that the matter offered as a confession was not prejudicial because it did not tend to prove guilt. The principle on the subject is thus stated in a note to section 219 of Greenleaf on Evidence: "The rule excludes not only direct confessions, but any other declaration tending to implicate the prisoner in the crime charged, even though, in terms, it is an accusation of another, or a refusal to confess. Rex v. Tyler, 1 C. & P. 129; Rex v. Enoch, 5 C. & P. 539. See further, as to the object of the rule, Rex v. Court, 7 C. & P. 486, per Littledale, J.; People v. Ward, 15 Wend. 231." Nor from the fact that in Wilson v. United States, 162 U.S. 613, *542 mention was made of the circumstance that the statement of the accused was a mere denial of guilt accompanied with exculpatory explanations, does the decision in that case conflict with the principle we have just stated. The ruling there made that error to the prejudice of the accused did not arise from the admission of the statement there considered, was based not alone upon the nature of the statement but upon "the evidence of its voluntary character; the absence of any threat, compulsion or inducement; or assertion or indication of fear; or even of such influence as the administration of an oath has been supposed to exert." (p. 624.)
The contradiction involved in the assertion that the statement of an accused tended to prove guilt, and therefore was admissible, and then after procuring its admission claiming that it did not tend to prove guilt, and could not, therefore, have been prejudicial, has been well stated by the Supreme Court of North Carolina, State v. Rorie, (1876) 74 N.C. 148:
"But the State says this was a denial of guilt and not a confession. It was a declaration which the State used to procure a conviction; and it is not for the State to say the declaration did not prejudice the prisoner's case. Why introduce it at all unless it was to lay a foundation for the prosecution? The use which was made of the prisoner's statement precluded the State from saying that it was not used to his prejudice." (p. 150.)
In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that no person "shall be compelled in any criminal case to be a witness against himself." The legal principle by which the admissibility of the confession of an accused person is to be determined is expressed in the textbooks.
In 3 Russell on Crimes, (6th ed.) 478, it is stated as follows:
"But a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied *543 promises, however slight, nor by the exertion of any improper influence... . A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted."
And this summary of the law is in harmony with the doctrine as expressed by other writers, although the form in which they couch its statement may be different. 1 Green. Ev. (15th ed.) § 219; Wharton Crim. Ev. (9th ed.) § 631; 2 Taylor Ev. (9th ed.) § 872²; 1 Bishop's New Crim. Proc. § 1217, par. 4.
These writers but express the result of a multitude of American and English cases, which will be found collected by the authors and editors either in the text or in notes, especially in the ninth edition of Taylor, second volume, tenth chapter, and the American notes, following page 588, where a very full reference is made to decided cases. The statement of the rule is also in entire accord with the decisions of this court on the subject. Hopt v. Utah, (1883) 110 U.S. 574; Sparf v. United States, (1895) 156 U.S. 51, 55; Pierce v. United States, (1896) 160 U.S. 355, and Wilson v. United States, (1896) 162 U.S. 613.
A brief consideration of the reasons which gave rise to the adoption of the Fifth Amendment, of the wrongs which it was intended to prevent and of the safeguards which it was its purpose unalterably to secure, will make it clear that the generic language of the Amendment was but a crystallization of the doctrine as to confessions, well settled when the Amendment was adopted, and since expressed in the text writers and expounded by the adjudications, and hence that the statements on the subject by the text writers and adjudications but formulate the conceptions and commands of the Amendment itself. In Boyd v. United States, 116 U.S. 616, attention was called to the intimate relation existing between the provision of the Fifth Amendment securing one accused against being compelled to testify against himself, and those of the *544 Fourth Amendment protecting against unreasonable searches and seizures; and it was in that case demonstrated that both of these Amendments contemplated perpetuating, in their full efficacy, by means of a constitutional provision, principles of humanity and civil liberty, which had been secured in the mother country only after years of struggle, so as to implant them in our institutions in the fullness of their integrity, free from the possibilities of future legislative change. In commenting on the same subject, in Brown v. Walker, 161 U.S. 591, 596, the court, speaking through Mr. Justice Brown, said:
"The maxim nemo tenetur seipsum accusare had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons, which has long obtained in the continental system, and, until the expulsion of the Stuarts from the British throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, was not uncommon even in England. While the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier state trials, notably in those of Sir Nicholas Throckmorton and Udal, the Puritan minister, made the system so odious as to give rise to a demand for its total abolition. The change in the English criminal procedure in that particular seems to be founded upon no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But, however adopted, it has become firmly embedded in English, as well as in American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person a part of their fundamental law, so that *545 a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment."
There can be no doubt that long prior to our independence the doctrine that one accused of crime could not be compelled to testify against himself had reached its full development in the common law, was there considered as resting on the law of nature, and was embedded in that system as one of its great and distinguishing attributes.
In Burrowes v. High Commission Court, (1616) Bulstr. pt. 3, page 48, Lord Coke makes reference to two decisions of the courts of common law as early as the reign of Queen Elizabeth, wherein it was decided that the right of a party not to be compelled to accuse himself could not be violated by the ecclesiastical courts. Whatever, after that date, may have been the departure in practice from this principle of the common law, (Taylor on Evidence, § 886²,) certain it is that, without a statute so commanding, in Felton's case, (1628) 3 How. St. Tr. 371, the judges unanimously resolved, on the question being submitted to them by the King, that "no such punishment as torture by the rack was known or allowed by our law."
Lord Hale died December 25, 1676. In the first volume of his Pleas of the Crown, 1st ed. 1736, treating of the subject of confessions in cases of treason, it is said at p. 304:
"That the confession before one of the Privy Council or a justice of the peace being voluntarily made without torture is sufficient as to the indictment on trial to satisfy the statute, and it is not necessary that it be a confession in court; but the confession is sufficient if made before him that hath power to take an examination."
In the second volume, at p. 225, it is said:
"When the prisoner is arraigned, and demanded what he saith to the indictment, either he confesseth the indictment, or pleads to it, or stands mute, and will not answer.
"The confession is either simple, or relative in order to the attainment of some other advantage.
"That which I call a simple confession is, where the defendant *546 upon hearing of his indictment without any other respect confesseth it, this is a conviction; but it is usual for the court, especially if it be out of clergy, to advise the party to plead and put himself upon his trial, and not presently to record his confession, but to admit him to plead. 27 Assiz. 40.
"If it be but an extra judicial confession, tho it be in court, as where the prisoner freely tells the fact, and demands the opinion of the court whether it be felony, tho upon the fact thus shown it appear to be felony, the court will not record his confession, but admit him to plead to the felony not guilty. 22 Assiz. 71, and Stamf. P.C. Lib. II, cap. 51, fol. 142b."
In chapter 38 of vol. 2, at p. 284, after referring to the power of justices of the peace and coroners, under the statutes of Philip and Mary, to take examinations of accused persons, but not upon oath, and that the same might be read in evidence on the trial of the prisoner, it is said:
"But then, 1. Oath must be made either by the justice or coroner, that took them, or the clerk that wrote them, that they are the true substance of what the informer gave in upon oath, and what the prisoner confessed upon his examination.
"2. As to the examination of the prisoner, it must be testified, that he did it freely without any menace, or undue terror imposed upon him; for I have known the prisoner disown his confession upon his examination, and hath sometimes been acquitted against such his confession; ..."
Gilbert, in his treatise on Evidence, (2d ed.  published in 1760,) says, at p. 140:
"... But then this confession must be voluntary and without compulsion; for our law in this differs from the civil law, that it will not force any man to accuse himself; and in this we do certainly follow the law of nature, which commands every man to endeavor his own preservation; and therefore pain and force may compel men to confess what is not the truth of facts, and consequently such extorted confessions are not to be depended on."
In Hawkins' Pleas of the Crown, (6th ed., by Leach  published in 1787,) book 2, chapter 31, it is said:
"SEC. 2... . And where a person upon his arraignment *547 actually confesses himself guilty, or unadvisedly discloses the special manner of the fact, supposing that it doth not amount to felony where it doth, yet the judges, upon probable circumstances, that such confession may proceed from fear, menace or duress, or from weakness, or ignorance, may refuse to record such confession, and suffer the party to plead not guilty."
In section 3, chap. 46, it is stated that examinations by the common law before a Secretary of State or other magistrate for treason or other crimes not within the statutes of Philip and Mary, and also the confession of the defendant himself in discourse with private persons, might be given in evidence against the party confessing. A note (2) to this section, presumably inserted by the editor, (see note to Gilham's case, 2 Moody, pp. 194-5,) reads as follows:
"The human mind under the pressure of calamity, is easily seduced; and is liable, in the alarm of danger, to acknowledge indiscriminately a falsehood or a truth, as different agitations may prevail. A confession, therefore, whether made upon an official examination or in discourse with private persons, which is obtained from a defendant, either by the flattery of hope, or by the impressions of fear, however slightly the emotions may be implanted, (vide O.B. 1786, page 387,) is not admissible evidence; for the law will not suffer a prisoner to be made the deluded instrument of his own conviction."
Although the English reports, prior to the separation, are almost devoid of decisions applying the principles stated by Lord Hale, Hawkins and Gilbert, both the opinion of Lord Mansfield in Rex v. Rudd, (1775) Cowp. 331, and that of Mr. Justice Wilson, some years after the separation, in Lambe's case, (1791) 2 Leach, (4th ed.) 552, make it certain that the rule as stated by Hawkins, Gilbert and Hale was considered in the English courts as no longer open to question and as one of the fundamental principles of the common law. Looking at the doctrine as thus established, it would seem plainly to be deducible that as the principle from which, under the law of nature, it was held that one accused could not be compelled *548 to testify against himself, was in its essence comprehensive enough to exclude all manifestations of compulsion, whether arising from torture or from moral causes, the rule formulating the principle with logical accuracy, came to be so stated as to embrace all cases of compulsion which were covered by the doctrine. As the facts by which compulsion might manifest itself, whether physical or moral, would be necessarily ever different, the measure by which the involuntary nature of the confession was to be ascertained was stated in the rule, not by the changing causes, but by their resultant effect upon the mind, that is, hope or fear, so that, however diverse might be the facts, the test of whether the confession was voluntary would be uniform, that is, would be ascertained by the condition of mind which the causes ordinarily operated to create. The well settled nature of the rule in England at the time of the adoption of the Constitution and of the Fifth Amendment, and the intimate knowledge had by the framers of the principles of civil liberty which had become a part of the common law, aptly explain the conciseness of the language of that Amendment. And the accuracy with which the doctrine as to confessions as now formulated embodies the rule existing at common law and embedded in the Fifth Amendment was noticed by this court in Wilson v. United States, supra, where, after referring to the criteria of hope and fear, speaking through Mr. Chief Justice Fuller, it was said: "In short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort." 162 U.S. 613, 623.
In approaching the adjudicated cases for the purpose of endeavoring to deduce from them what quantum of proof, in a case presented, is adequate to create, by the operation of hope or fear, an involuntary condition of the mind, the difficulty encountered is, that all the decided cases necessarily rest upon the state of facts which existed in the particular case, and, therefore, furnish no certain criterion, since the conclusion that a given state of fact was adequate to have produced an involuntary confession does not establish that the same result has been created by a different although somewhat similar condition *549 of fact. Indeed, the embarrassment which comes from the varying state of fact, considered in the decided cases, has given rise to the statement that there was no general rule of law by which the admissibility of a confession could be determined, but that the courts had left the rule to be evolved from the facts of each particular case. 2 Taylor Ev. § 872². And, again, it has been said that so great was the perplexity resulting from an attempt to reconcile the authorities that it was manifest that not only must each case solely depend upon its own facts, but that even the legal rule to be applied was involved in obscurity and confusion. Green v. State, 88 Georgia, 516; State v. Patterson, 73 Missouri, 695, 705; State v. Matthews, 66 N.C. 106, 109.
The first of these statements but expresses the thought that whether a confession was voluntary was primarily one of fact, and therefore every case must depend upon its own proof. The second is obviously a misconception, for, however great may be the divergence between the facts decided in previous cases and those presented in any given case, no doubt or obscurity can arise as to the rule itself, since it is found in the text of the Constitution. Much of the confusion which has resulted from the effort to deduce from the adjudged cases what would be a sufficient quantum of proof to show that a confession was or was not voluntary, has arisen from a misconception of the subject to which the proof must address itself. The rule is not that in order to render a statement admissible the proof must be adequate to establish that the particular communications contained in a statement were voluntarily made, but it must be sufficient to establish that the making of the statement was voluntary; that is to say, that from the causes, which the law treats as legally sufficient to engender in the mind of the accused hope or fear in respect to the crime charged, the accused was not involuntarily impelled to make a statement, when but for the improper influences he would have remained silent. With his understanding of the rule we come to a consideration of the authorities.
By statutes enacted early in the second half of the sixteenth century, 1 & 2 Ph. & M. c. 13 and 2 & 3 Ph. & M. c. 10, *550 justices of the peace were directed on accusations of felony to "take the examination of the said prisoner and information of them that bring him." In 1655, the judges directed that the examination of prisoners should be without oath, J. Kel. 2, and the reason of this rule, Starkie on Evidence, (2d ed. p. 29) says, was that an examination under oath "would be a species of duress and a violation of the maxim that no one is bound to criminate himself." The ruling of the judges in this regard was recognized in the statute of 7 George IV, chap. 64, which, although requiring "information of witnesses" to be "upon oath," simply directed an "examination" of the accused.
But, even where the examination was held without oath, it came to be settled by judicial decisions in England that before such an examination could be received in evidence it must appear that the accused was made to understand that it was optional with him to make a statement. Rex v. Green, (1832) 5 Car. & P. 312; Reg. v. Arnold, (1838) 8 Car. & P. 621. The reason upon which this rule rested undoubtedly was, that the mere fact of the magistrate's taking the statement, even though unaccompanied with an oath, might, unless he was cautioned, operate upon the mind of the prisoner to impel him involuntarily to speak. The judicial rule as to caution was finally embodied into positive law by the statute of 11 & 12 Vict. c. 42, where, by section 18, the magistrate was directed, after having read or caused to be read to the accused the depositions against him, to ask the accused: "Having heard the evidence, do you wish to say anything in answer to the charge? You are not obliged to say anything unless you desire to do so, but whatever you say will be taken down in writing, and may be given in evidence against you upon your trial."
The English courts were frequently called upon to determine whether language used by a magistrate when about to take the examination of one accused, tended to induce in the mind of the latter such hope or fear as to lead to involuntary mental action. In Reg. v. Drew, (1837) 8 Car. & P. 140, and Reg. v. Harris, (1844) 1 Cox C.C. 106, though the accused had been cautioned not to say anything to prejudice himself, *551 the further statement, in substance, by the magistrate or his clerk, that what the prisoner said would be taken down, and "would" be used for or against him at his trial, was held by Coleridge, J., to be equivalent to saying that what the prisoner chose to say might be used in his favor at the trial, and was a direct inducement to make a confession, rendering the statement incompetent as evidence. Like rulings were also made in cases where similar assurance that the statement of the prisoner would be used were made to him by a police officer. Reg. v. Morton, (1843) 2 Moo. & Rob. 514, and Reg. v. Furley, (1844) 1 Cox C.C. 76.
In cases where statements of one accused had been made to others than the magistrate upon an examination, differences of opinion arose among the English judges, as to whether a confession made to a person not in a position of authority over the accused, was admissible in evidence after an inducement has been held out to the prisoner by such person. Rex v. Spencer, (1837) 7 Car. & P. 776. It was finally settled, however, that the effect of inducements must be confined to those made by persons in authority, Reg. v. Taylor, (1839) 8 Car. & P. 733; Reg. v. Moore, (1852)2 Den. C.C. 522; although, in the last cited case, while former precedents were followed, the court expressed strong doubts as to the wisdom of the restriction. (p. 527.) There can be no question, however, that a police officer, actually or constructively in charge of one in custody on a suspicion of having committed crime, is a person in authority within the rule, and as this is so well established, we will not consider the adjudicated cases in order to demonstrate it, but content ourselves with a reference to the statement on the subject made in Russell on Crimes, third volume, at page 501.
Many other cases in the English reports illustrate the application of the rule excluding statements made under inducement improperly operating to influence the mind of an accused person.
In Rex v. Thompson, (1783) 1 Leach, (4th ed.) 291, a declaration to a suspected person that unless he gave a more satisfactory account of his connection with a stolen bank note his *552 interrogator would take him before a magistrate, was held equivalent to stating that it would be better to confess, and to have operated to lead the prisoner to believe that he would not be taken before a magistrate if he confessed. Baron Hotham, after commenting upon the evidence, in substance, said that the prisoner was hardly a free agent at the time, as though the language addressed to him scarcely amounted to a threat, it was certainly a strong invitation to the prisoner to confess, the manner in which it had been expressed rendering it more efficacious.
In Cass' case, (1784) 1 Leach, 293, a confession induced by the statement of the prosecutor to the accused, "I am in great distress about my irons; if you will tell me where they are, I will be favorable to you," was held inadmissible. Mr. Justice Gould said that the slightest hopes of mercy held out to a prisoner to induce him to disclose the fact was sufficient to invalidate a confession.
In the cases following, statements made by a prisoner were held inadmissible, because induced by the language set out in each case: In Rex v. Griffin, (1809) Russ. & Ry. 151, telling the prisoner that it would be better for him to confess; in Rex v. Jones, (1809) Russ. & Ry. 152, the prosecutor saying to the accused that he only wanted his money, and if the prisoner gave him that he might go to the devil, if he pleased; in Rex v. Kingston, (1830) 4 Car. & P. 387, saying to the accused, "you are under suspicion of this, and you had better tell all you know;" in Rex v. Enoch and Pulley, (1833) 5 Car. & P. 539, saying: "You had better tell the truth or it will lie upon you, and the man go free;" in Rex v. Mills, (1833) 6 Car. & P. 146, saying: "It is no use for you to deny it, for there is the man and boy who will swear they saw you do it;" in Sherrington's case, (1838) 2 Lewin C.C. 123, saying: "There is no doubt thou wilt be found guilty, it will be better for you if you will confess;" in Rex v. Thomas, (1833) 6 Car. & P. 353, saying: "You had better split, and not suffer for all of them;" in Rex v. Simpson, (1834) 1 Moody, 410, and Ry. & Mood. 410, repeated importunities by neighbors and relatives of the prosecutor, coupled with assurances to the *553 suspected person that it would be a good deal worse for her if she did not, and that it would be better for her if she did confess; in Rex v. Upchurch, (1836) 1 Moody, 465, saying: "If you are guilty, do confess; it will perhaps save your neck; you will have to go to prison; if William H. (another person suspected, and whom the prisoner had charged) is found clear, the guilt will fall on you. Pray, tell me if you did it;" in Reg. v. Croydon, (1846) 2 Cox C.C. 67, saying: "I dare say you had a hand in it; you may as well tell me all about it;" in Reg. v. Garner, (1848) 1 Den. C.C. 329, saying: "It will be better for you to speak out."
In Reg. v. Fleming, (1842) Arm., M. & O. 330, statements of a police officer suspected of having committed a crime, in answer to questions propounded by his superior in office, after the latter had warned the accused to be cautious in his answers, were held inadmissible. The court said: "The prisoner and the witnesses being both in the police force, the prisoner, as the witness admitted, might have conceived himself bound to tell the truth; and the caution was not of that nature which should make the confession of the prisoner admissible."
In the leading case of Reg. v. Baldry, (1852) 2 Den. C.C. 430, after full consideration, it was held that the declaration made to a prisoner, who had first been cautioned that what he said "would" be used as evidence, merely imported that such statement "might" be used, and could not have induced in the mind of the prisoner a hope of benefit sufficient to lead him to make a statement. The cases of Reg. v. Drew, Reg. v. Harris, Reg. v. Morton and Reg. v. Furley, heretofore referred to, were held to have been erroneously decided.
In the course of the argument, counsel for the prisoner cited and commented upon Cass' case, Rex v. Thomas, Sherrington's case and Rex v. Enoch, also heretofore referred to, as illustrating the doctrine that assuring the accused that it would be better for him to speak or other intimation given of possible benefit would invalidate a confession thus induced. After counsel had concluded his reference to these cases, Pollock, C.B., said (p. 432): "There is no doubt as to the application *554 of the rule in those cases, which are all familiar to the judges and to the bar."
In the course of the opinion, subsequently delivered by him, Chief Baron Pollock said (p. 442):
"A simple caution to the accused to tell the truth, if he says anything, has been decided not to be sufficient to prevent the statement made being given in evidence; and although it may be put that when a person is told to tell the truth, he may possibly understand that the only thing true is that he is guilty, that is not what he ought to understand. He is reminded that he need not say anything, but if he says anything let it be true. It has been decided that that would not prevent the statement being received in evidence by Littledale, J., in the case of Rex v. Court, 7 Car. & P. 486, and by Rolfe, B., in a case at Gloucester, Reg. v. Holmes, 1 Car. & K. 248; but where the admonition to speak the truth has been coupled with any expression importing that it would be better for him to do so, it has been held that the confession was not receivable,  the objectionable words being that it would be better to speak the truth, because they import that it would be better for him to say something. This was decided in the case of Reg. v. Garner, 1 Den. C.C. 329. The true distinction between the present case and a case of that kind is, that it is left to the prisoner a matter of perfect indifference whether he should open his mouth or not."
In Reg. v. Moore, (1852) 2 Den. C.C. 522, also decided by the Court of Criminal Appeal, an admonition to a person suspected of crime that she "had better speak the truth," was held not to vitiate a subsequent confession, because not made by a person in authority. Parke, B., delivering the opinion of the judges, said, in substance, (p. 526,) that one element in the consideration of the question whether a confession ought to be excluded was "whether the threat or inducement was such as to be likely to influence the prisoner," and "that if the threat or inducement was held out, actually or constructively by a person in authority, it cannot be received, however slight the threat or inducement."
*555 In Reg. v. Cheverton, (1862) 2 F. & F. 833, a statement made by a policeman to a person in his custody, that "you had better tell all about it, it will save you trouble," was held to operate as a threat or inducement sufficient to render what was said by the prisoner inadmissible.
In Reg. v. Fennell, (1881) 7 Q.B.D. 147, the Court for Crown Cases Reserved referred approvingly to the statement of the rule contained in Russell on Crimes, and, "upon all the decided cases," held inadmissible a statement made induced by the prosecutor saying to the prisoner in the presence of an inspector of police: "The inspector tells me you are making housebreaking implements; if this is so, you had better tell the truth, it may be better for you."
The latest decision in England on the subject of inducement, made by the Court for Crown Cases Reserved is Reg. v. Thompson, (1893) 2 Q.B. 12. At the trial a confession was offered in evidence, which had been made by the defendant before his arrest upon the charge of having embezzled funds of a certain corporation. Objection was interposed to its reception in evidence, on the ground that it had been made under the operation of an inducement held out by the chairman of the company in a statement to a relative of the accused, intended to be and actually communicated to the latter, that "it will be the right thing for Marcellus (the accused) to make a clean breast of it." The evidence having been admitted and the prisoner convicted, the question was submitted to the upper court whether the evidence of the confession was properly admitted. The opinion of the appellate court was delivered by Cave, J., and concurred in by Lord Coleridge, C.J., Hawkins, Day and Wills, JJ. After stating and adopting the ruling of Baron Parke in Reg. v. Warringham, 2 Den. C.C. 447 n, to the effect that it was the duty of the prosecutor to satisfy the trial judge that the confession had not been obtained by improper means, and that where it was impossible to collect from the proof whether such was the case or not, the confession ought not to be received, the opinion referred approvingly to the declaration of Pollock, C.B., in Reg. v. Baldry, that the true ground of the *556 exclusion of statements not voluntary was that "it would not be safe to receive a statement made under any influence or fear." The court then quoted the rule laid down in Russell on Crimes as being a statement of the principles which had been restated and affirmed by the Lord Chief Justice in the Fennell case, and added:
"If these principles and the reasons for them are, as it seems impossible to doubt, well founded, they afford to magistrates a simple test by which the admissibility of a confession may be decided. They have to ask  Is it proved affirmatively that the confession was free and voluntary  that is, was it preceded by any inducement to make a statement held out by a person in authority? If so, and the inducement has not clearly been removed before the statement was made, evidence of the statement is inadmissible."
After reviewing the evidence and holding that, under the ruling of Pollock, C.B., in the Baldry case, it was immaterial whether the statements made by the chairman were calculated to elicit the truth, and intimating that they tended to lead the prisoner to believe that it would be better for him to say something, the opinion concluded with deciding that "on the broad, plain ground that it was not proved satisfactorily that the confession was free and voluntary," the confession ought not to have been received.
Whilst, as we have said, there is no question that a police officer having a prisoner in custody is a person in authority within the rule in England, and therefore that any inducement by him offered, calculated to operate upon the mind of the prisoner, would render a confession as a consequence thereof inadmissible, there seems to be doubt in England whether the doctrine does not extend further, and hold that the mere fact of the interrogation of a prisoner by a police officer would per se render the confession inadmissible, because of the inducement resulting from the very nature of the authority exercised by the police officer, assimilating him in this regard to a committing or examining magistrate. 3 Russell on Crimes, p. 510, note t. In Reg. v. Johnston, 15 Ir. Com. Law, 60 (1864), this subject was elaborately considered by the *557 Irish Court of Criminal Appeal, seven of the judges writing opinions, and the majority concluding, on a full consideration of the English and Irish authorities, that a policeman was not such an official as would render per se any confession elicited by his questioning the prisoner inadmissible, although the fact of his questioning became an important element in determining whether inducement resulted from the language by him used. The English authorities, however, referred to in the above note to Russell on Crimes are later in date than Reg. v. Johnston, although they emanate from nisi prius courts and not from appellate tribunals. Whatever be the rule in this regard in England, however, it is certain that where a confession is elicited by the questions of a policeman, the fact of its having been so obtained, it is conceded, may be an important element in determining whether the answers of the prisoner were voluntary. The attempt on the part of a police officer to obtain a confession by interrogating has been often reproved by the English courts as unfair to the prisoner and as approaching dangerously near to a violation of the rule protecting an accused from being compelled to testify against himself. Berriman's case, (1854) 6 Cox C.C. 388; Cheverton's case, (1862) 2 F. & F. 833; Mick's case, (1863) 3 F. & F. 822; Regan's case, (1867) 17 L.T. (N.S.) 325, and Reason's case, (1872) 12 Cox C.C. 228.
From this review it clearly appears that the rule as to confessions, by an accused, (leaving out of consideration the rule now followed in England restricting the effect of inducements, according as such inducements were or were not held out by persons in authority,) is in England to-day what it was prior to and at the adoption of the Fifth Amendment, and that whilst all the decided cases necessarily rest upon the state of facts which the cases considered, nevertheless the decisions as a whole afford a safe guide by which to ascertain whether in this case the confession was voluntary, since the facts here presented are strikingly like those considered in many of the English cases.
We come then to the American authorities. In this court the general rule that the confession must be free and voluntary, *558 that is, not produced by inducements engendering either hope or fear, is settled by the authorities referred to at the outset. The facts in the particular cases decided in this court, and which have been referred to, manifested so clearly that the confessions were voluntary, that no useful purpose can be subserved by analyzing them. In this court also it has been settled that the mere fact that the confession is made to a police officer, while the accused was under arrest in or out of prison, or was drawn out by his questions, does not necessarily render the confession involuntary, but, as one of the circumstances, such imprisonment or interrogation may be taken into account in determining whether or not the statements of the prisoner were voluntary. Hopt v. Utah, 110 U.S. 174; Sparf v. United States, 156 U.S. 51, 55. And this last rule thus by this court established is also the doctrine upheld by the state decisions.
In the various state courts of last resort the general rule we have just referred to, that a confession must be voluntary, is generally recognized; although in Indiana there is a statute authorizing confessions obtained by inducements to be given in evidence to the jury with all the attending circumstances, except when made under the influence of fear produced by threats, while it is also provided that a conviction cannot be had by proof of a confession made under inducement, "without corroborating testimony." Rev. Stat. Ind. 1881, § 1802. And, in the Texas Code of Procedure, article 750, it is provided that confessions shall not be used against a prisoner at his trial, "if, at the time it was made, the defendant was in jail or other place of confinement, nor where he was in custody of an officer, unless such confession be made in the voluntary statement of the accused, taken before an examining court in accordance with law; or be made voluntarily, after having been first cautioned that it may be used against him; or unless, in connection with such confession, he make statement of facts or of circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or instrument with which he states the offence was committed." Tex. Rev. Stat. 1879.
*559 The English doctrine which restricts the operation of inducements solely to those made by one in authority has been adopted by some state courts, but disapproved of in others, as in Ohio. Spears v. State, 2 Ohio St. 583. Whether it is one which should be followed by this court in view of the express terms of the Constitution, need not be now considered, as it does not arise under the state of facts here presented. In some it is also held that the fact that the accused is examined on oath by a magistrate or coroner, or by a grand jury, with or without an oath, will, per se, exclude confessions, because of the influence presumed to arise from the authority of the examining officer or body. People v. McMahon, (1857) 15 N.Y. 384, followed in People v. Mondon, (1886) 103 N.Y. 211, 218; State v. Matthews, (1872) 66 N.C. 106; Jackson v. State, (1879) 56 Mississippi, 311, 312; State v. Clifford, (1892) 86 Iowa, 550. This doctrine as to examining magistrates is in some States enforced by statutes somewhat similar in character to the English statutes. (2 Taylor Ev. § 888, note 2.)
In some of the States it has been held that where questions are propounded to a prisoner by one having a right to ask them, and he remains silent, where from the nature of the inquiries, if innocent, reply would naturally be made, the fact of such silence may be weighed by the jury. See authorities collected in Chamberlayne's note to 2 Taylor Ev. 5884, et seq.
Having stated the general lines upon which the American cases proceed, we will not attempt to review in detail the numerous decisions in the various courts of last resort in the several States, treating of confessions in the divergent aspects in which that doctrine may have presented itself but will content ourselves with a brief reference to a few leading and well considered cases treating of the subject of inducements, and which are, therefore, apposite to the issue now considered.
In the following cases, the language in each mentioned, was held to be an inducement sufficient to exclude a confession or statement made in consequence thereof: In Kelly v. State, (1882) 72 Alabama, 244, saying to the prisoner, "You have got your foot in it, and somebody else was with you; *560 now, if you did break open the door, the best thing you can do is to tell all about it, and to tell who was with you, and to tell the truth, the whole truth, and nothing but the truth;" in People v. Barrie, 49 California, 342, saying to the accused, "it will be better for you to make a full disclosure;" in People v. Thompson, (1890) 84 California, 598, 605, saying to the accused, "I don't think the truth will hurt anybody. It will be better for you to come out and tell all you know about it, if you feel that way;" in Beery v. United States, (1893) 2 Colorado, 186, 188, 203, advising the prisoner to make full restitution, and saying, "if you do so it will go easy with you; it will be better for you to confess; the door of mercy is open and that of justice closed;" and threatening to arrest the accused and expose his family if he did not confess; in State v. Bostick, (1845) 4 Harr. (Del.) 563, saying to one suspected of crime, "the suspicion is general against you, and you had as well tell all about it, the prosecution will be no greater, I don't expect to do anything with you; I am going to send you home to your mother;" in Green v. State, (1891) 88 Georgia, 516, saying to the accused, "Edmund, if you know anything, it may be best for you to tell it;" or, "Edmund, if you know anything, go and tell it, and it may be best for you;" in Rector v. Commonwealth, (1882) 80 Kentucky, 468, saying to the prisoner in a case of larceny, "it will go better with you to tell where the money is, all I want is my money, and if you will tell me where it is, I will not prosecute you hard;" in Biscoe v. State, (1887) 67 Maryland, 6, saying to the accused, "it will be better for you to tell the truth and have no more trouble about it;" in Commonwealth v. Nott, (1883) 135 Mass. 269, saying to the accused, "you had better own up; I was in the place when you took it; we have got you down fine; this is not the first you have taken, we have got other things against you nearly as good as this;" in Commonwealth v. Meyers, (1894) 160 Mass. 530, saying to the accused, "you had better tell the truth;" in People v. Wolcott, (1883) 51 Michigan, 612, saying to the accused, "it will be better for you to confess;" in Territory v. Underwood, (1888) 8 Montana, 131, saying to the prisoner that it would be better *561 to tell the prosecuting witness all about it, and that the officer thought the prosecuting witness would withdraw the prosecution or make it as light as possible; in State v. York, (1858) 37 N.H. 175, saying to one under arrest immediately before a confession, "if you are guilty you had better own it;" in People v. Phillips, (1870) 42 N.Y. 200, saying to the prisoner, "The best you can do is to own up; it will be better. for you;" in State v. Whitfield, (1874) 70 N.C. 356, saying to the accused, "I believe you are guilty; if you are you had better say so; if you are not you had better say that;" in State v. Drake, (1893) 113 N.C. 624, saying to the prisoner, "if you are guilty, I would advise you to make an honest confession; it might be easier for you. It is plain against you;" in Vaughan v. Commonwealth, (1867) 17 Gratt. 576, saying to the accused, "you had as well tell all about it."
We come, then, to a consideration of the circumstances surrounding, and the facts established to exist, in reference to the confession, in order to determine whether it was shown to have been voluntarily made. Before analyzing the statement of the police detective as to what took place between himself and the accused it is necessary to recall the exact situation. The crime had been committed on the high seas. Brown, immediately after the homicide, had been arrested by the crew in consequence of suspicion aroused against him, and had been by them placed in irons. As the vessel came in sight of land, and was approaching Halifax, the suspicions of the crew having been also directed to Bram, he was arrested by them and placed in irons. On reaching port, these two suspected persons were delivered to the custody of the police authorities of Halifax and were there held in confinement awaiting the action of the United States consul, which was to determine whether the suspicions which had caused the arrest justified the sending of one or both of the prisoners into the United States for formal charge and trial. Before this examination had taken place the police detective caused Bram to be brought from jail to his private office, and when there alone with the detective he was stripped of his clothing, and either whilst the detective was in the act of so stripping him, or after he was *562 denuded, the conversation offered as a confession took place. The detective repeats what he said to the prisoner, whom he had thus stripped, as follows:
"When Mr. Bram came into my office I said to him: `Bram, we are trying to unravel this horrible mystery.' I said: `Your position is rather an awkward one. I have had Brown in this office, and he made a statement that he saw you do the murder.' He said: `He could not have seen me. Where was he ?' I said: `He states he was at the wheel.' `Well,' he said, `he could not see me from there.'"
The fact, then, is, that the language of the accused, which was offered in evidence as a confession, was made use of by him as a reply to the statement of the detective that Bram's co-suspect had charged him with the crime, and, although the answer was in the form of a denial, it was doubtless offered as a confession because of an implication of guilt which it was conceived the words of the denial might be considered to mean. But the situation of the accused, and the nature of the communication made to him by the detective, necessarily overthrows any possible implication that his reply to the detective could have been the result of a purely voluntary mental action; that is to say, when all the surrounding circumstances are considered in their true relations, not only is the claim that the statement was voluntary overthrown, but the impression is irresistibly produced that it must necessarily have been the result of either hope or fear, or both, operating on the mind.
It cannot be doubted that, placed in the position in which the accused was when the statement was made to him that the other suspected person had charged him with crime, the result was to produce upon his mind the fear that if he remained silent it would be considered an admission of guilt, and therefore render certain his being committed for trial as the guilty person, and it cannot be conceived that the converse impression would not also have naturally arisen, that by denying there was hope of removing the suspicion from himself. If this must have been the state of mind of one situated as was the prisoner when the confession was made, how in reason *563 can it be said that the answer which he gave and which was required by the situation was wholly voluntary and in no manner influenced by the force of hope or fear? To so conclude would be to deny the necessary relation of cause and effect. Indeed, the implication of guilt resulting from silence has been considered by some state courts of last resort, in decided cases, to which we have already made reference, as so cogent that they have held that where a person is accused of guilt, under circumstances which call upon him to make denial, the fact of his silence is competent evidence as tending to establish guilt. Whilst it must not be considered that by referring to these authorities we approve them, it is yet manifest that if learned judges have deduced the conclusion that silence is so weighty as to create an inference of guilt, it cannot, with justice, be said that the mind of one who is held in custody under suspicion of having committed a crime, would not be impelled to say something, when informed by one in authority that a co-suspect had declared that he had seen the person to whom the officer was addressing himself, commit the offence, when otherwise he might have remained silent but for fear of the consequences which might ensue; that is to say, he would be impelled to speak either for fear that his failure to make answer would be considered against him, or of hope that if he did reply he would be benefited thereby. And these self-evident deductions are greatly strengthened by considering the place where the statements were made and the conduct of the detective towards the accused. Bram had been brought from confinement to the office of the detective, and there, when alone with him, in a foreign land, while he was in the act of being stripped or had been stripped of his clothing, was interrogated by the officer, who was thus, while putting the questions and receiving answers thereto, exercising complete authority and control over the person he was interrogating. Although these facts may not, when isolated each from the other, be sufficient to warrant the inference that an influence compelling a statement had been exerted, yet when taken as a whole, in conjunction with the nature of the communication made, they give room to the strongest inference *564 that the statements of Bram were not made by one who in law could be considered a free agent. To communicate to a person suspected of the commission of crime the fact that his co-suspect has stated that he has seen him commit the offence, to make this statement to him under circumstances which call imperatively for an admission or denial and to accompany the communication with conduct which necessarily perturbs the mind and engenders confusion of thought, and then to use the denial made by the person so situated as a confession, because of the form in which the denial is made, is not only to compel the reply but to produce the confusion of words supposed to be found in it, and then use statements thus brought into being for the conviction of the accused. A plainer violation as well of the letter as of the spirit and purpose of the constitutional immunity could scarcely be conceived of.
Moreover, aside from the natural result arising from the situation of the accused and the communication made to him by the detective, the conversation conveyed an express intimation rendering the confession involuntary within the rule laid down by the authorities. What further was said by the detective ? "Now, look here, Bram, I am satisfied that you killed the captain from all I have heard from Mr. Brown. But," I said, "some of us here think you could not have done all that crime alone. If you had an accomplice, you should say so, and not have the blame of this horrible crime on your own shoulders." But how could the weight of the whole crime be removed from the shoulders of the prisoner as a consequence of his speaking, unless benefit as to the crime and its punishment was to arise from his speaking? Conceding that, closely analyzed, the hope of benefit which the conversation suggested was that of the removal from the conscience of the prisoner of the merely moral weight resulting from concealment, and therefore would not be an inducement, we are to consider the import of the conversation, not from a mere abstract point of view, but by the light of the impression that it was calculated to produce on the mind of the accused, situated as he was at the time the conversation took place. Thus viewed, the weight to be removed by speaking naturally imported *565 a suggestion of some benefit as to the crime and its punishment as arising from making a statement.
This is greatly fortified by a consideration of the words which preceded this language  that is, that Brown had declared he had witnessed the homicide, and that the detective had said he believed the prisoner was guilty and had an accomplice. It, in substance, therefore, called upon the prisoner to disclose his accomplice, and might well have been understood as holding out an encouragement that by so doing he might at least obtain a mitigation of the punishment for the crime which otherwise would assuredly follow. As said in the passage from Russell on Crimes already quoted, "the law cannot measure the force of the influence used or decide upon its effect upon the mind of the prisoner, and, therefore, excludes the declaration if any degree of influence has been exerted." In the case before us we find that an influence was exerted, and as any doubt as to whether the confession was voluntary must be determined in favor of the accused, we cannot escape the conclusion that error was committed by the trial court in admitting the confession under the circumstances disclosed by the record.
Our conclusion that the confession was wrongfully admitted renders it unnecessary to pass on the serious question arising from the ruling of the trial court by which in cross-examination the accused was denied the right to ask the detective as to an article of personal property taken from the prisoner at the time the alleged confession was had. In other words, that the accused could not bring out by way of cross-examination everything which took place at the time of the alleged confession, but was compelled, in order to do so, to make the detective his own witness, and therefore be placed in the position where he could not impeach him. We are also, as the result of our conclusion on the subject of the confession, relieved from examining the many other assignments of error, except in so far as they present questions which are likely to arise on the new trial.
We will now briefly consider the alleged errors of this character.
*566 By plea and supplemental plea in abatement, and by motion to quash, defendant, preliminary to the trial, attacked the sufficiency of the indictment, because one of the grand jurors was permitted to affirm and the indictment failed to state that such juror was "conscientiously scrupulous" of being sworn, and because the indictment recited that it was presented upon the "oath" of the jurors, when, in fact, it was presented upon the oath and affirmation of the jurors. At the hearing of the pleas in abatement, it appeared that when the grand jurors were empanelled one of them, upon being called to be sworn, stated that he affirmed, and declined to take an oath, and after his fellows had been regularly sworn he was formally affirmed to the same duties specified in the oath administered to the others. It is also stated in the record, following the recital of the issuance of venires for grand and petit jurors, that 
"In obedience to the said order of court, and to the venires issued thereunder, the following-named grand jurors attended on the fifteenth day of October, A.D. 1896. On that day the said grand jurors were duly empanelled as the grand jury for the October term of this court, A.D. 1896. All of said grand jurors, being empanelled aforesaid, were duly sworn, except grand juror William Merrill, Junior, of West Newbury, who duly affirmed, twenty-one grand jurors being in attendance."
In section 1 of the Revised Statutes of the United States it is provided, among other things, that, in determining the meaning of the Revised Statutes, "a requirement of an `oath' shall be deemed complied with by making affirmation in judicial form." Section 800 also provides that 
"Jurors to serve in the courts of the United States, in each State respectively, shall have the same qualifications, subject to the provisions hereinafter contained, and be entitled to the same exemptions, as jurors of the highest court of law in such State may have and be entitled to at the time when such jurors for service in the courts of the United States are summoned; and they shall be designated by ballot, lot, or otherwise, according to the mode of forming such juries then practised in such state courts, so far as such may be practicable *567 by the courts of the United States or the officers thereof. And for this purpose the said courts may, by rule or order, conform the designation and empanelling of juries, in substance, to the laws and usages relating to jurors in the state courts, from time to time in force in such State. This section shall not apply to juries to serve in the courts of the United States in Pennsylvania."
The Public Statutes of Massachusetts, 1882, chap. 213, section 6, provide as follows:
"SECTION 6. When a person returned as grand juror is conscientiously scrupulous of taking the oath before prescribed, he shall be allowed to make affirmation, substituting the word `affirm' instead of the word `swear,' and also the words `this you do under the pains and penalties of perjury' instead of the words `so help you God.'"
And section 3 of chapter 3 of the same statutes provides as follows (p. 58):
"In the construction of statutes the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the general court or repugnant to the context of the same statute, that is to say, ... Fourteenth. The word `oath' shall include `affirmation' in cases where, by law, an affirmation may be substituted for an oath."
The objection that the indictment recited that it was presented "upon the oath" of the jurors, when the fact was that it was presented upon the "oath and affirmation" of the jurors, is without merit. Waiving a consideration of the question whether, under the provisions of the statutes to which reference has been made, the word "oath" might not properly be construed as meaning either "oath" or "affirmation," the recital alluded to was purely formal, and if defective was open to amendment. The record disclosing the fact that all of the grand jurors were duly sworn except grand juror William Merrill, Junior, who was "duly affirmed," the defendant could not have been prejudiced by the form of the statement made in the indictment, and the defect, if any, was rendered harmless by the curative provisions of section 1025, Revised Statutes.
*568 The further objection that neither in the indictment nor in the proof at the hearing of the pleas in abatement was it affirmatively stated or shown that grand juror Merrill, before being permitted to affirm, was proven to have possessed conscientious scruples against taking an oath, is practically concluded by the disposition made of the objection just passed upon, and is rendered nugatory by the terms of § 1025, Revised Statutes. Further, the mode of ascertaining the existence or non-existence of such conscientious scruples was committed to the discretion of the officer who affirmed the juror, and such affirmation conclusively established that the officer had properly exercised his discretion. Commonwealth v. Fisher, 7 Gray, 492; State v. Adams, 78 Maine, 486.
The remaining assignments which we deem it proper to notice relate to the overruling of objections interposed to questions propounded to certain witnesses in the character of experts. Some of these objections were made to hypothetical questions asked a number of sailors, reciting the condition of things assumed to have been established by the evidence as existing about the time of the killing, viz., the speed of the Herbert Fuller, the condition of her sails, direction of wind, etc., an inquiry as to the effect it would have on the vessel if the wheelman had taken his hands off the wheel, and what effect would be produced by lashing the wheel under similar conditions. These questions were evidently intended to supplement the testimony of Brown, who swore that he stood with both hands on the wheel during the time between twelve and two o'clock, and, consequently, when the murders were committed. The questions were competent, as the testimony sought to be elicited was relevant to the issue. Aside from the testimony of Brown the evidence against Bram was purely circumstantial, and it was clearly proper for the Government to endeavor to establish, as a circumstance in the case, the fact that another person who was present in the vicinity at the time of the killing, could not have committed the crime. The testimony sought to be adduced had this tendency, and the fact that it might operate indirectly to fortify the credit of such person as a witness in the cause could not affect its admissibility.
*569 An objection to a question asked of a medical witness, whether, in his opinion, a man standing at the hip of a recumbent person and striking blows on that person's head and forehead with an axe would necessarily be spattered with, or covered with, some of the blood, was also properly overruled. We think the assumed facts recited in the question were warranted by the proof in the case, and that the evidence sought to be elicited from the witness was of a character justifying an expression of opinion by the witness, the jury after all being at liberty to give to the evidence such weight as in their judgment it was entitled to. Hopt v. Utah, 120 U.S. 430.
The judgment is reversed and the cause remanded with directions to set aside the verdict and to order a new trial.
MR. JUSTICE BREWER, with whom concurred MR. CHIEF JUSTICE FULLER, and MR. JUSTICE BROWN, dissenting.
I dissent from the opinion and judgment in this case 
First, because I think the testimony was not open to objection. "A confession, if freely and voluntarily made, is evidence of the most satisfactory character." Hopt v. Utah, 110 U.S. 574, 584; reaffirmed in Sparf v. United States, 156 U.S. 51, 55. The fact that the defendant was in custody and in irons does not destroy the competency of a confession. "Confinement or imprisonment is not in itself sufficient to justify the exclusion of a confession, if it appears to have been voluntary, and was not obtained by putting the prisoner in fear, or by promises." Sparf v. United States, supra; see also Wilson v. United States, 162 U.S. 613, 623.
The witness Power, when called, testified positively that no threats were made nor any inducements held out to Bram, and this general declaration he affirmed and reaffirmed in response to inquiries made by the court and the defendant's counsel. The court, therefore, properly overruled the objection at that time made to his testifying to the statements of defendant. It is not suggested that there was error in this ruling, and the fact that inducements were held out is deduced only from the testimony subsequently given by Power of the *570 conversation between him and Bram. The first part of that conversation is as follows: "When Mr. Bram came into my office, I said to him: `Bram, we are trying to unravel this horrible mystery.' I said: `Your position is rather an awkward one. I have had Brown in this office, and he made a statement that he saw you do the murder.' He said: `He could not have seen me; where was he?' I said: `He states he was at the wheel.' `Well,' he said, `he could not see me from there.'" In this there is nothing which by any possibility can be tortured into a suggestion of threat or a temptation of hope. Power simply stated the obvious fact that they were trying to unravel a horrible mystery, and the further fact that Brown had charged the defendant with the crime, and the replies of Bram were given as freely and voluntarily as it is possible to conceive.
It is strange to hear it even intimated that Bram up to this time was impelled by fear or allured by hope caused in the slightest degree by these statements of Power.
The balance of the conversation is as follows: "I said, `Now, look here, Bram, I am satisfied that you killed the captain from all I have heard from Mr. Brown. But,' I said, `some of us here think you could not have done all that crime alone. If you had an accomplice, you should say so, and not have the blame of this horrible crime on your own shoulders.' He said: `Well, I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it.' He was rather short in his replies." And here, it is argued, was a suggestion of a benefit  the holding out of a hope that a full disclosure might somehow inure to his advantage. To support this contention involves a refinement of analysis which, while it may show marvellous metaphysical ability, is of little weight in practical affairs. But even if it did carry any such improper suggestion it was made at nearly the close of the conversation, and that this suggestion then made had a retroactive effect and transformed the previous voluntary statements of Bram into statements made under the influence of fear or hope, is a psychological process which I am unable to comprehend. The only reply *571 which Bram made to the question containing this supposed improper suggestion was this: "Well, I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it." Can it for a moment be thought that such a reply was so significant that, permitting it to go to the jury, compels the putting at naught this protracted trial, and overthrowing the deliberate verdict of the twelve men who heard the evidence and condemned the defendant? With all respect to my brethren who are of a different opinion, I can but think that such a contention is wholly unsound, and that in all this conversation with Bram there was nothing of sufficient importance to justify the reversal of the judgment.
Again, there is a lack of any proper objection or exception, and if there is any one thing which may be considered as settled in all appellate courts it is that an error in the admission of testimony will not be considered unless there was a specific objection and exception at the trial. "To authorize any objection to the admission or exclusion of evidence, or to the giving or refusal of any instructions to the jury, to be heard in this court, the record must disclose not merely the fact that the objection was taken in the court below, but that the parties excepted at the time to the action of the court thereon." Hutchins v. King, 1 Wall. 53, 60; United States v. McMasters, 4 Wall. 680, 682. "Our power is confined to exceptions actually taken at the trial." Railway Company v. Heck, 102 U.S. 120. See also Moore v. Bank of Metropolis, 13 Pet. 302; Camden v. Doremus, 3 How. 515; Zeller's Lessee v. Eckert, 4 How. 289, 297; Phelps v. Mayer, 15 How. 160; Dredge v. Forsyth, 2 Black, 563; Young v. Martin, 8 Wall. 354; Belk v. Meagher, 104 U.S. 279; Hanna v. Maas, 122 U.S. 24; White v. Barber, 123 U.S. 392, 419; Stewart v. Wyoming Cattle Ranche Co., 128 U.S. 383; Anthony v. Louisville & Nashville Railroad, 132 U.S. 172; Block v. Darling, 140 U.S. 234; Bogk v. Gassert, 149 U.S. 17.
It is true these were civil cases. For it is only in the later history of this court that we have had jurisdiction of writs of *572 error in criminal cases, but the law is equally applicable to the latter. "It is the duty of counsel seasonably to call the attention of the court to any error in empanelling the jury, in admitting testimony, or in any other proceeding during the trial, by which his rights are prejudiced, and in case of an adverse ruling to note an exception." Alexander v. United States, 138 U.S. 353, 355. "The general rule undoubtedly is that an objection should be so framed as to indicate the precise point upon which the court is asked to rule." Sparf v. United States, 156 U.S. 51, 56; Holder v. United States, 150 U.S. 91; Tucker v. United States, 151 U.S. 164.
It is true the defendant objected to the admission of the conversation before it was given, but upon the state of facts as then presented unquestionably the trial court ruled properly in permitting the witness to testify, for he positively declared that there was neither threat nor promise, intimidation or inducement. If it be true, as the court now holds, that in the progress of his testimony it was developed that he did make a statement which carried an inducement  a suggestion of hope  it was then the duty of the defendant to call the attention of the court to the matter, either by objecting to any further disclosures of the conversation, or else by a motion to strike out. Nothing of the kind took place. Defendant was apparently content to let all of the subsequent conversation come in. Can it be held that the court erred in not of its own motion stopping the witness, or striking out the testimony, or instructing the jury to disregard it, when defendant asked nothing of the kind? Surely by this decision we practically overrule the long line of authorities heretofore cited affirming the necessity of calling the attention of the trial court to the specific matter, obtaining its ruling thereon and saving an exception thereto before there is any jurisdiction in this court to review. Nor is this a mere technical and arbitrary rule which may be dispensed with whenever the exigencies of any case seem to demand, and in no other way a ground for reversal can be discovered. It may be, and, undoubtedly, often is the case, that though incompetent testimony be given the defendant prefers that it shall remain in order, *573 for certain purposes, to take advantage of it in the argument before the jury. Can it be possible that he may obtain this advantage, and, having obtained and used it, insist that, because of such incompetent testimony, he is entitled to a reversal of the judgment against him? Wilson v. United States, 162 U.S. 613, 624. Who shall say that this defendant, though at first objecting to any testimony respecting his statements, yet, after hearing what the witness said, did not prefer that such testimony remain, as it disclosed that, at the very first moment he was informed that Brown charged him with the crime, he protested that Brown was not in a position where he could see who did the killing? Indeed, for anything in this record to the contrary, he, when a witness in his own behalf, may have given the same version of the conversation, and admitted that his statements were voluntarily made. Who shall say that he did not wish to argue before the jury that the claim made of Brown's inability to see what took place was not an excuse suggested only by the exigencies of the trial, but was presented at the very first moment of the charge; and if he was willing to let the testimony remain and have all the advantage which he could take of it in argument before the jury, can it be that he can now come to this court and say "true I did not object to this specific testimony, nor ask to have it stricken out, but it was incompetent," and obtain a reversal on the ground of its admission?
I dissent, therefore, first, because I think the testimony was properly received; and, secondly, because no motion was made to strike it out and no exception taken to its admission.