## QUESTIONS OCCURRING AT A TRIAL FOR HOMICIDE.

[Circuit Court of Lucas County.]

ALBERT WADE v. STATE OF OHIO, AND BENJAMIN E. WADE v.
STATE OF OHIO.

Decided, October 22, 1903.

*Criminal Law—Confession of Defendant—Whether Made Voluntarily
Shown at a Subsequent Trial of a Confederate—Dying Declaration
—Statement not Made in View of Death, but Death Followed—
Res Gestae—Statement by Accused Before Grand Jury—Facts Jus-
tifying a Verdict of Guilty of Murder in the First Degree.*

1. A confession is voluntary, and is competent evidence against the person
making it where it appears that no threats or promises were used in ob-
taining it, and that before the making of the confession the person to
whom it was made, who was not an officer, informed the accused that
he had no power to grant him immunity from punishment, but that if
he wished he could speak.

2. Where a man charged with murder voluntarily goes before the grand
jury and makes a statement of what he knows about the case and after-
wards, during the trial at a preliminary examination had in the absence
of the jury to determine the circumstances under which such statement
was made and whether it was voluntary, testifies that his statement be-
fore the grand jury was true, and it was shown had been made with the
knowledge, consent and under the advice of his counsel, evidence of
his statements made before the grand jury is competent evidence against
him upon his trial.

3. A verdict in a homicide case will not be set aside and a new trial granted
on the ground that newly discovered evidence shows that a person who
had been in the penitentiary was seen in the neighborhood at about the
time the crime was committed, where there is no evidence that such
person was implicated in or connected with the crime or had any knowl-
edge of it.

4. Declarations made by a person shortly after an assault in which she re-
ceived injuries which caused her death are not competent as dying dec-
larations upon the trial of her assailants, where it does not appear that at
the time of making such declarations she knew or believed that she was
about to die.

5. Declarations made by the victim of a homicide some time after the as-
sault which caused her death, at a house sixty rods distant from the
scene of the crime, narrating certain facts in regard to the assault, are
not part of the *res gestae* and are not competent evidence upon the trial
of her assailants.

HULL, J.; PARKER, J., and HAYNES, J., concur.

The cases of The State of Ohio v. Albert Wade and of The State of Ohio v. Benjamin E. Wade, while not heard together, were heard one immediately after the other, and will be decided together. The two plaintiffs in error, defendants below, will be referred to here as the defendants. They were jointly indicted in 1902 by the grand jury of Lucas county for murder in the first degree. The charge was that these two defendants, together with Benjamin Landis—who was jointly indicted with them—while perpetrating a robbery, murdered one Katherine Sullivan. The defendants were tried separately and found guilty of murder in the first degree and sentenced to death. Petitions in error were filed in this court by each of the defendants to reverse that judgment.

The crime was alleged to have been committed in the evening of April 14, 1900, near the westerly limits of the city of Toledo, at or near a small place called Trilby. At that place lived Katherine Sullivan, and her sister, Johanna Sullivan, was visiting her at that time, in the little house where Katherine lived, some six or seven miles from this court house. They were elderly women—maiden ladies—and at this time were living there alone. At about 8 o'clock on the evening of April 14, 1900, being the night before Easter Sunday, Katherine Sullivan, the one who died, appeared at the house of Henry Wendt, a neighbor who resided about sixty rods from her house. She was badly injured, had been beaten about her head and body, and blood was flowing from her wounds; her clothing and her hair were saturated with it; her limbs still partially bound, and she was still partly gagged with strips of table-cloth. She called for help, and Mr. Wendt went out into the yard and brought her into the house. She was laid upon the floor, being in great agony, a physician was called, treatment given her, and some time the following morning she died. A post-mortem examination revealed many wounds on her head made with a blunt instrument, causing injury to the brain, which produced death. Her body was bruised, and her jawbone was broken, and there were two wounds in her throat, probably produced by the ends of the broken bones.

Johanna Sullivan, the other sister, about the same time Katherine reached Wendt's house, appeared at the house of Mr. Giles Pelton, another of her neighbors. She also had been beaten and wounded very seriously about the head and body, and was also covered with blood; and was partially bound at this time with strips of table-cloth. She was taken care of by Mr. Pelton, and soon after the neighbors were aroused and the Sullivan house visited. The kitchen of the house was found to have been the place where the murderous assault was committed. There were pools of blood upon the floor; blood dashed against the walls of the kitchen, and possibly some of it on or near the ceiling, a pool of blood being on the floor near the stove, where it afterwards appeared that Katharine fell. Two bloody clubs were found in the kitchen, made of green wood—the green limbs of trees, apparently—heavy and tough. They were covered with blood. They had been cut fresh and the bark peeled off, and were about the size of a policeman's club or "billy."

Some time later these defendants, while in the penitentiary for another offense, were indicted for this crime. They were indicted in 1901 or the early part of 1902. On account of some defect in the indictment they were again indicted in November, 1902. After the date of the homicide, the defendants, Albert and Benjamin Wade and Landis, had been sentenced to the Ohio Penitentiary for the commission of another crime—that of horse stealing—and were there together. Prior to the date of this homicide Benjamin Wade had been in the penitentiary twice. After coming out the last time he came to Toledo and there joined Benjamin Landis, in the fall of 1899, and for some time after—according to the testimony of Benjamin Wade given on his trial—he and Landis carried on a series of crimes in and about this county in the way of horse stealing, burglaries, chicken stealing and other crimes of that character. This was in the fall and winter of 1899-1900, during the few months before this murder was committed. A week or two before Katherine Sullivan was killed, Albert Wade, who was then at Kendalville, Indiana, and who had been in the penitentiary with Benjamin and Landis, came to Toledo at the request and solicitation of Landis and Benjamin Wade, they going to Indiana and

asking him to come to Toledo to aid them in their criminal enterprises that they were carrying on, he to receive a salary of so much per week, and his businss to be that of disposing of, by way of sale and barter, the stolen plunder which they might accumulate. Nothing at that time, it is claimed, was said to Albert about any assault or robbery being contemplated upon the Sullivan sisters; and, yielding to their solicitations, contrary to the entreaties of his wife, Benjamin testified that Albert came with Landis and himself to Toledo, Landis returning upon a passenger train and the others upon a freight train; and about a week or so after that, this homicide occurred.

Considering first the case of Albert Wade, the brother of Benjamin, who was tried first below, it is claimed that error was committed against him in the overruling of a motion for a new trial on the ground of newly discovered evidence. An alleged confession of Albert Wade was admitted in evidence upon his trial over his objection—a confession made to Nicholas Miller, who had formerly been the Sheriff of Putnam County, Ohio. At the trial of Benjamin Wade, which followed that of Albert, Nicholas Miller, upon examination as a witness, it is claimed, disclosed that the confession of Albert Wade was made to him by reason of promises made and inducements held out to Albert Wade at the time he made this confession, and that was the chief ground urged for the granting of a new trial and for the reversal of the judgment by this court. There were other claims of newly discovered evidence that I will speak of later.

Nicholas Miller testified in the case against Albert Wade. He first met Albert in the penitentiary, although he had known Benjamin Wade before that time, and had seen him in different prisons and jails in northwestern Ohio. Benjamin and Albert were both in the penitentiary. Miller had heard of the Sullivan murder, and while he was sheriff of Putnam county, he met Benjamin Wade upon a train, Benjamin having been taken to some county to be a witness in a criminal case; and Benjamin asked Miller to come and see him at the penitentiary when he came to Columbus, and told him that he would ''give him the Sullivan job''—using that language—if he came; that there was money in it for him.

Subsequently Miller, whose term as sheriff had expired, went to Columbus, and called at the penitentiary and saw Benjamin, and talked with him, telling him that he was no longer sheriff, that he was not an officer, although he had been; that he had no power to promise any immunity or favor; that that could come only from the authorities of Lucas county, and especially from the prosecuting attorney. He had known Benjamin for a good while, however, and had seen him, and perhaps had had him in his custody once, and he advised Benjamin, if he was connected with the Sullivan murder, to tell all that he knew. At that time Benjamin asked Miller if he, Miller, thought he, Wade, was connected with the Sullivan murder, and Miller told him that he did. I am now speaking of Benjamin and not Albert, but this preceded the confession of Albert. Benjamin was doubtful whether the prosecuting attorney could grant immunity in a case of murder in the first degree, and disputed it, insisting that even if he did, the people would not submit to it. Miller insisted that the prosecutor had such power and discussed the matter with him. Benjamin seemed to understand the law, for he discussed it intelligently, and finally the attorney-general of the state was consulted, at the suggestion of one of these parties, he being mentioned in the discussion between Miller and Benjamin, and the attorney-general when consulted, stated that under the law the prosecuting attorney might grant immunity even in a case of murder in the first degree. Miller stated to Benjamin, however, that he had no power to promise him immunity; that that could only come from the Lucas county authorities, and that what he, Miller, wanted, as he put it, was "a land-mark" from one or the other of these men showing that they had knowledge of the Sullivan murder, in order that he might send for the prosecuting attorney and officers of Lucas county. Benjamin asked Miller whether there would be any difference in the immunity granted depending upon who told first; and Miller told him that in his judgment—and, perhaps, told him positively—that the one who spoke first would get the most immunity; told him that the authorities were anxious to convict Landis of this murder, and that if he and Albert told all that they knew, that in his judgment Benjamin would be let off with

a light punishment, but with a somewhat longer term of imprisonment than Albert, and Albert would get off with very little punishment, but telling him throughout the conversation from time to time that this must all come from the officers of Lucas county; and when he told Benjamin that the one who spoke first would get the most immunity, Benjamin said he wanted his brother to speak first, as he had a family.

Then Albert came into the office—Miller suggesting to Benjamin that he bring Albert—and Albert was brought in and introduced to Miller by Benjamin. After Albert's introduction to Miller there was a little further talk between Miller and Benjamin in the presence of Albert, but what that was is not clear from the record. Benjamin had brought Albert in, and he may have communicated to Albert what Miller had said to him, but upon that the record is silent; and Miller then spoke to Albert and told him, that he had no power to grant immunity, but if he wished to speak he could speak.

The talk between Albert and Miller before the confession was very brief. It might almost be said that the presumption from this record is that Benjamin had communicated to Albert the substance of what Miller had told him, and the prosecuting attorney said, in argument, that it might be so considered.

Finally Albert said "I saw the fatal blow struck." Miller said that is a "landmark," and advised him to tell all, saying that he would send for the Lucas county officers; that he had sufficient warrant to send for them. One of the Toledo detectives had been to Columbus prior to that time, and the Wades had refused to talk with him.

Thereupon Albert made a statement to Miller in the penitentiary in regard to the crime—a confession—and he told about his going to Toledo from Indiana; and after he had been here a short time, towards evening on Saturday, the night before Easter, 1900, he said he hitched up the horse to the buggy and he, Landis, and Benjamin started for the country, going about, here and there; that they got out before dark in the neighborhood of the Sullivan house; that one of them, Landis, went over to the Sullivan house for matches; that before that time they had gone to the woods and Landis had put

on a wig and a mask which disguised him, and which Albert said made him look "so funny." He said that in the woods they cut two clubs and stripped the bark off of them. That about 7 o'clock, or earlier in the evening, the three, Benjamin, Albert and Landis, went to the house of the Sullivan sisters; that they pushed open the door; that Benjamin Wade and Landis—whom they called "Frank"—rushed in. One of the sisters was at the door—either Benjamin or Landis going first—which, perhaps, is not very clearly shown; that the sister who came to the door was stricken down with a club; the other one, following closely upon the leader, attacked the other sister—and a terrific struggle ensued between Katherine and the man who attacked her, and finally the other one came to his help, and she was struck senseless and they both lay upon the floor. Albert claimed that he, all the time, stood at the door, and not taking any part in the actual assault upon the women. He spoke of their terrible cries while they were being beaten and gave the whole story of the murder in detail.

Miller telegraphed, or telephoned, at once to the prosecuting attorney of this county, and he went to Columbus with another officer of Lucas county on the following day and they met the Wades, Albert and Benjamin. The prosecutor, who regarded Landis as the leader, stated to them that if they would tell all that they knew about this crime, tell the whole transaction, and tell the truth, that he would save them from the electric chair. This is not disputed. Thereupon both Albert and Benjamin refused to talk, refused to make any statement to the prosecutor. Benjamin insisted—he seemed to take the lead—that he should be given his liberty before he talked; that he should have absolute immunity; that he should be released and held only as a witness; that he should be allowed to visit his wife, or the woman with whom he lived, at Dayton; that his freedom should be given him before he made any statement as to this case to the authorities. The prosecutor told him that he wanted nothing but the truth—that he wanted "no lies" —and the Wades became somewhat angry and refused to make any statement of the case to the prosecuting attorney.

On the trial of Albert Wade this confession was put in evidence by the testimony of Miller; but what Miller said to Albert and said to Benjamin in regard to the immunity that they might get from the prosecuting officers of the state, in his judgment, was not in evidence, Miller not testifying to it then, but did at the trial of Benjamin Wade, which followed that of Albert; and the testimony of Miller at the trial of Benjamin Wade, in which he testified to what he had said to Benjamin and Albert upon this occasion—the testimony of Miller at that trial was filed with an affidavit proving its authenticity, in support of the motion for a new trial of Albert Wade, on the ground of newly discovered evidence. There were some other affidavits filed to support the motion for a new trial of Albert Wade, showing that there was a man in that neighborhood about the time of the commission of this offense, by the name of William Brandt, who had been in the penitentiary; but there was no evidence that Brandt had committed the crime. There was one affidavit showing that the lock on the small house or shanty, or shed, near the Sullivan home was of an old make which would be difficult to open— there being testimony tending to show that the murderers went to this little house and got into it to get some money. This affidavit was made to Mr. Pelton and was filed as newly discovered evidence.

Going back to the Miller affidavit, or the affidavit showing Miller's testimony, in the Benjamin Wade trial, the question is, whether a confession made under those circumstances should have been admitted? It might be said that this was not newly discovered evidence; that Albert had full knowledge of all this during his trial, and that he had sat there and could inform his counsel; and that upon the preliminary examination, before the confession was admitted, he might have gone upon the witness-stand in the absence of the jury and have testified; but we are not inclined to draw the lines very strictly upon this in a capital case, and are asked by the prosecution to consider this question in the light of all the testimony which has been gathered together either during or after the trial of Albert Wade.

A confession, to be admitted, under all the authorities, must be a voluntary one. If it is induced by promises made by an officer of immunity, or induced by threats or fear of injury emenating from an officer, it will not be admitted. If promises are held out and inducements made by those who are not officers and have no authority, then, whether the confession shall be admitted is a question of fact to be determined by the court—whether, under all the circumstances, the confession is voluntary or not. Or if in doubt, the court may submit that question to the jury with the alleged confession. The jury may be excluded, as was done in this case, by the court, and witnesses called before the trial judge to determine whether the confession was voluntary. And the defendant may call witnesses to show that it was not; and to exclude such testimony has been held error, and finally the question is decided by the trial judge under the evidence, as to whether the confession about to be offered shall be admitted or not.

A confession, if freely and voluntarily made, as laid down by all the authorities, is evidence of the highest character against the accused, if clearly proved, for it is his own statement of his connection with the crime with which he is charged. He, of all others, knows whether the charge against him is true or false, and if his statement is freely and voluntarily made, no better or more convincing evidence can be brought before a court or jury. But confessions that are not voluntarily made, or are produced by threats, by fear or by hopes, are excluded, on the ground, as stated by Greenleaf, that they are probably not true. There is a temptation for the accused to state, even against himself, that which is not true, where he has been induced to confess by hope or fear or by threats. And as stated by the Supreme Court of the United States, another ground for the exclusion is, that it is a violation of and an infringement upon the fifth amendment to the Constitution of the United States, which provides that no man shall be required to give evidence against himself. For, if he is required or compelled by threats or induced by hopes to make a confession against himself, it is an indirect method of compelling him to give evidence against himself, when statements made under

such circumstances are afterwards proven against him in court. But the fact that a confession is made to an officer does not exclude it under the law of this state. The fact that the confession, in his judgment, will be a benefit to the accused, or that it will be to his advantage to make a confession, does not exclude it. The fact that the statement was made to him by a private individual, not an officer, that it will be best for him to tell all, does not exclude it, if, after considering all of the evidence, the court can be satisfied that the confession was freely and voluntarily made.

A case in the 2d Ohio State, 584, *Spear* v. *The State*, discusses the subject of confessions. The opinion was by Judge Thurman. This is from the syllabus:

"No confession can be received in evidence in a criminal case, unless it was voluntary.

"A confession induced by hope or fear, excited in the mind of the prisoner by the representations or threats of any one, is not to be considered as voluntary.

"The question in every case, where a confession has followed representations or threats, is, was it produced by them?

"This question is to be decided by the judge, if proof of the confession, when offered, is objected to.

"In deciding it he is to have regard to the following rule:

"If the representations or threats were made by, or in the presence of a person having authority or control over the prosecution or the accused, it is to be presumed that the confession was produced by such representations or threats, unless it appear that their influence was totally done away before the confession was made. If, on the other hand, the representations or threats were made by a person having no such authority or control, and not in such presence, it is not necssarily to be presumed that they induced the confession.

"In the latter case, the judge is to determine how the confession was produced by looking at the circumstances, among which are the strength or weakness of the prisoner's intellect, his knowledge or ignorance.

"If satisfied, however, that the confession was produced by the representations or threats, the court can not receive it in evidence, because the prisoner had sufficient mind or knowledge to detect the groundlessness of the representations or threats; for the strongest mind is liable to be unhinged, and the question is not what the prisoner ought to have believed, but what he did believe?"

This case really covers the whole law upon this subject in this state.

There is a general discussion of this subject in the first volume of Greenleaf on Evidence. In Section 219 the author says:

"The rule of law, applicable to all cases, only demands that the confession shall have been made voluntary, without the appliances of hope or fear, by any other person; and whether it was so made or not is for him (the judge) to determine, upon consideration of the age, situation, and character of the prisoner, and the circumstances under which it was made."

In Section 229, Vol. I, Greenleaf says:

"Though it is necessary to the admissibility of a confession that it should have been voluntarily made, as before shown, without the appliances of hope or fear from persons having authority, yet it is not necessary that it should have been the prisoner's spontaneous act. It will be received, though it were induced by spiritual exhortations, whether of a clergyman or of any other person; by a solemn promise of secrecy, even confirmed by an oath; or by reason of the prisoner's having been made drunken; or by a promise of some collateral benefit or boon, no hope or favor being held out in respect to the criminal charge against him; or by any deception practiced on the prisoner, or false representation made to him for that purpose, provided there is no reason to suppose that the inducement held out was calculated to produce any untrue confession, which is the main point to be considered. So, a confession is admissible, though it is elicited by questions, whether put to the prisoner by a magistrate, officer, or private person; and the form of the question is immaterial to the admissibility, even though it assumes the prisoner's guilt."

And in this state a confession has been properly admitted, although it was procured by a deception in stating to the prisoner that his accomplice had confessed. In 18 Ohio St., 419, the syllabus is as follows:

"In order to exclude the evidence of confessions by the defendant in a criminal case, it is not enough to show that they were made to an officer having him in custody, and were induced by a false assurance that an accomplice had given information of the crime, if it also appears that nothing was said or done calculated to induce a hope of advantage from confession, or fear of harm from its refusal."

The doctrine in this case runs contrary to the doctrine of a case found in Vol. 168, p. 532, U. S. Reports (*Bram* v. *United States*), where it was held that the court below erred in admitting a confession or statement made to an officer. The prisoner in that case was charged with the commission of a murder upon the high seas, and when the vessel reached Halifax he was imprisoned and finally taken before a police officer and stripped—or while he was being stripped of his clothing was interrogated. This question was asked the officer, who was a witness:

"What did you say to him or he to you?"

And the witness answered:

"When Mr. Bram came into my office I said to him: 'Bram, we are trying to unravel this horrible mystery.' I said 'Your position is rather an awkward one. I have had Brown in this office and he made a statement that he saw you do the murder.' He said: 'He could not have seen me; where was he?' I said: 'He states he was at the wheel.' 'Well,' he said, 'he could not see me from there.' I said: 'Now, look here, Bram, I am satisfied that you killed the captain from all I have heard from Mr. Brown. But, I said, 'some here think you could not have done all that crime alone. If you had an accomplice, you should say so, and not have the blame of this horrible crime on your own shoulders.' He said: 'Well, I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it.' He was rather short in his replies."
"*Q.* Anything further said by either of you?"
"*A.* No; there was nothing further said on that occasion."

*Held:*

"(1) That this statement made by the accused to a police officer was evidently not a voluntary confession, and was not admissible in evidence against him; (2) that the objection to its admission having been twice presented and regularly allowed, it was not necessary that it should be renewed at the termination of the testimony of the witness."

The above is from the syllabus.

Mr. Justice White delivered the opinion of the court and discusses the question at great length. The majority of the court held that this statement of the accused, made under these circumstances to an officer who stated to him, substantially, that

his suspected accomplice had told that he had seen him commit the crime, he being at the time in custody, should not have been admitted. Chief-Justice Fuller, Justice Brewer and Justice Brown dissent from this opinion, Justice Brewer delivering the dissenting opinion.

The circumstances of this case are different from that reported in the Supreme Court Report, at least in this; that the person to whom the confession was made here was not an officer; had no authority over the liberty of Wade—no authority to do him harm or to give him favors, and that fact Miller had expressly stated to the Wades before the confession was made. Nor do we think that the law as stated in the majority opinion in *Bram v. U. S.* is the law of this state.

We are of the opinion that under the law of this state and the general law of the land, the confession of Albert Wade made to Miller in the penitentiary was properly received by the trial judge and should have been admitted, even if this testimony as to Miller's statement to the Wades, at the time of the confession, had been before the court. It was for the trial judge to say in the first instance, after he had heard all the evidence on this subject, in Albert Wade's case, whether the confession should be admitted or not. We consider the question in the light of the testimony of Miller at the subsequent trial of Benjamin Wade, and we hold that with that before the court the confession of Albert Wade would have been properly admitted. Miller testified in the Albert Wade case that he made no promises to Albert Wade, nor does he testify in Benjamin Wade's case that he made any promises to Albert Wade—he says he did not. He had his talk in the first instance with Benjamin Wade and he stated to Benjamin that he could make no promises; he stated what was usual and customary for the State to do in such a case in the way of immunity, and Benjamin Wade seemed to be familiar with the rule—where a man "turned state's evidence;" but Miller told them that he could not promise immunity; that he was not an officer and they must depend upon the action of the Toledo authorities for that. The evidence shows that when the prosecuting attorney and the officer came to Columbus and offered immunity, if they would make confession and furnish

evidence against Landis, that they refused to make a statement, and neither Albert nor Benjamin did testify in the trial of Landis. Albert seems to have been a man of sufficient intelligence to understand his situation. Both he and Benjamin Wade—and one of these men can not be discussed without the other, the cases are so connected—were anxious; they were afraid at that time that Landis would tell. This talking and this inclination to confess arose to a great extent from information that they got from time to time that Landis was threatening to "turn up the Sullivan murder"—to put it in the vernacular of these men—and "put it on" the Wade boys, and they were anxious to be the first to tell.

Where a crime like this is committed, in the night with no eye-witness but the criminals themselves, if the statement of one of those who was engaged in the crime can be secured by the State by fair and legitimate means, it is the State's duty and that of its officers to procure it. It is of the highest importance that the commission of such an offense be punished, and that no innocent man suffer, and we can have no higher guaranty that the guilty are punished than their own statements of their guilt, if they are freely and voluntarily made; and it appears to us that this confession is not open to the objection of the law that it was not a free and voluntary act of Albert Wade, taking into consideration all that occurred upon his trial, and taking into consideration further in his favor all that the records disclosed as occurring upon the trial of his brother, Benjamin Wade.

As to the other so-called newly discovered evidence in regard to William Brandt being seen in the nighborhood, that would not be sufficient to set aside the verdict; there is no evidence that Brandt was implicated in or connected with this crime, or had anything to do with it or knowledge of it.

Coming now to the case of Benjamin Wade—I may not touch upon every alleged error in these records and every point urged, but if I do not, it will not be because we have not considered them, for we have considered them all. The two chief grounds relied upon in this case for reversal are: First, the exclusion of the testimony of Henry Wendt as to the state-

ments of Katherine Sullivan, the murdered woman, made on the night that she received her injury; and, second, in the admission of the statement of Benjamin Wade made before the grand jury that returned the indictment in November, 1902.

First, as to the exclusion of this evidence. It was to Wendt's house to which Katherine went after she recovered consciousness, perhaps an hour after the assault. Both of these women were unconscious for a time. Wendt was called as a witness and testified as to her condition and as to her cries for help. The defense called. him as a witness when they came to offer their testimony and counsel asked him: "What did she say to you when she came there as to what had transpired at her house?" An objection was made to this question by the State and sustained by the court. Counsel for defense then stated: "We expect to prove that Katherine Sullivan came to Mr. Wendt's house about 8 or 8:30 and said that two men assailed her and beat her; that if there had been only one, she could have handled him, but she couldn't handle two; that she couldn't identify these men because they had masks on their faces." The objection was still sustained by the court.

It is claimed that this testimony should have been admitted, upon two grounds: that it was a dying declaration; and that it was a part of the *res gestae.* The ground most relied upon is the latter. It was not a dying declaration. A dying declaration is one made, as the courts say, *in articulo mortis,* and with the knowledge and belief that one is about to die. As stated by the Supreme Court in *Robbins* v. *State,* 8 O. S. Rep., 131:

"It is essential to the admissibility of dying declarations as evidence, that it should be made to appear to the court, by preliminary evidence, not only that they were made *in articulo mortis,* but also made under a sense of impending death, which excluded from the mind of the dying person all hope or expectation of recovery."

There is no evidence here that Katherine Sullivan at this time knew or believed that she was about to die; she did not die until the following morning. The declarations to be admissible must be made, as the authorities say, under the awful circumstances of impending death, and when the party himself knows,

or firmly believes that he is about to die, such circumstances being held to be equivalent to the binding obligation of a solemn oath; and the probability is that a person surrounded by such circumstances, about to be ushered into eternity, would tell the truth, that the probability is as great as it is where an oath has been administered. This statement was not made under such circumstances, and was properly excluded.

It is urged that it was a part of the *res gestae*—a part of the things done upon that night. Things that are said, words that are spoken in such close connection with acts done that they are a part of them, are admitted in evidence; they are not excluded as hearsay; they are regarded as the instinctive outbursts of the mind, and are to be considered in connection with the things that are done and as a part of them, *"res gestae"* meaning "Things that are done", as laid down in the law dictionaries. Anderson says in his law dictionary, page 887:

*"Res Gestae.* The circumstances, facts and declarations which grow out of the main fact, are contemporaneous with it, and serve to illustrate its character. * * * The area of events covered by the term depends upon the circumstances of each case. * * * It is not possible to lay down a rule as to what is a part of the *res gestae* which will be decisive of the question in every case in which it may be presented by the ever varying phases of human affairs. Included in it are facts which so illustrate and characterize the principal fact as to constitute the whole one transaction, and render the latter necessary to exhibit the former in its true light and give it its proper effect."

In Abbott's Trial Brief, page 546, paragraph 266, the author says:

"The rule of the *res gestae* admits declarations made under the impulse of the occasion, though somewhat separated in time and place, if so woven into it by the circumstances as to receive credit from it."

In Wharton's Criminal Evidence, Section 262-3, there is a discussion of this question. At the beginning of Section 262 the author says:

*"Res gestae* are events speaking for themselves, through the instinctive words and acts of participants when narrating the events. What is done or said by participants, under the im-

mediate spur of a transaction, becomes thus part of the transaction, because it is then the transaction that thus speaks.''

It is claimed that this alleged statement of Katherine Sullivan was important because it is claimed that she stated then that there were only two men there, that two men assailed her; that she could have handled one, but not two, and that she could not identify these men. In our judgment, this declaration of Katherine can not be considered as a part of the *res gestae*. Those words were not the involuntary outburst of her heart or mind on that occasion. She was then in a house some sixty rods from the place where this crime had been committed about an hour before. Just how long she had been at Wendt's house does not appear; or whether this statement was made in answer to questions or not, and it is a narration, at all events, of what had occurred. These were not word facts, or verbal deeds; they were not connected with the transaction itself. It is not an outcry that she made as she was being assaulted, crying out that two men were assaulting her. In our judgment this can not be considered as part of the *res gestae*. If she had stated on that occasion that Benjamin Wade was one of her assailants and struck her, that could not have been admitted as against Benjamin Wade; it would have been error; it would not have been a statement by her made under oath nor under the belief that she was about to die, and to have admitted it against Wade would have been error. And besides the statement itself, in the light of all the testimony in the case, she might have made and been within the truth, as is shown by this record as claimed by the State. She perhaps only saw two men; one was outside. There were probably only two who committed the actual assault. She probably did not recognize them, as they all had masks on at the beginning, and, according to the testimony of Johanna Sullivan—the one who lived—the masks were not taken off until she and her sister both lay upon the floor, as they did, Johanna feigning death and having been pronounced dead by one of the murderers, and then, Johanna says, the masks were taken off and she recognized the defendants. So we hold that under the rules of law this testimony was not admissible. And, if it had been admitted, it would have been in the line of the truth of the transac-

tion as she saw it, and as the State claims—for the evidence does tend to show as I have stated that but two actually committed the assault and one was standing at the door, and if admitted it would in fact have been corroborative of the State's case rather than in opposition to its claims. So we hold that, upon the most liberal view, Benjamin Wade was not prejudiced by the exclusion of this testimony.

It is complained that the statement made by Benjamin Wade before the grand jury was admitted in evidence against him at the trial. The grand jury met in November, and it is claimed that this statement made before the grand jury was made because of the hopes and inducements and promises held out to him by various persons before he went into the grand jury room to testify. The grand jury met in November, 1902, over two years after this murder was committed. The talk to which I have referred, with Miller, had occurred at the penitentiary several months prior to that time. Wade had, on the next day when the prosecuting attorny came, refused to become a witness for the State unless he was given his absolute liberty. After being released from the penitentiary, having served out his time for horse stealing, he was brought to the jail of Lucas county. He was assigned as counsel, Mr. Mulholland and Judge Sala. An attorney from Findlay, Mr. Burket—who was interested in a murder case in another county that Landis had been implicated in or connected with in some manner with Marsh Lindsey, Ury and Foster—talked to him and urged upon him that it would be better for him to make a full statement of the facts; and Miller, and perhaps others did the same, and when the grand jury met he indicated his desire to appear before it and make a statement. He was asked if he wanted to talk with Burket, and he said "No; why should I when I have counsel?" He talked with his counsel, Mulholland, fully in the county jail, and discussed the matter with him, and under the advice of counsel adopted his course.

The prosecuting attorney, in order that no possible advantage might be taken of defendant, then in prison, had a subpœna issued for Mr. Mulholland, his counsel, to bring him before the grand jury; and in answer to that subpæna he came, and the

prosecutor then informed Mr. Mulholland that his client wished to come before the grand jury and make a statement and that they wished to ascertain whether he had any objections. Mr. Mulholland said that he had told Mr. Wade to use his own judgment in the matter,. and when the officer went to the jail after Wade, he was found in consultation with his attorney, Mulholland; and with the advice that Wade got from Miller, from Burket and from his own counsel, and considering the question himself, he went before the grand jury; and there the statement was made to him by the prosecuting attorney that they were investigating his case, and that he might make a statement if he desired. Mr. Charles Sumner was then prosecutor. Wade was told that he could make a statement without questions being asked if he wished to, and he proceeded then to make his statement.

He made a statement as to his association with Landis in Toledo. He said he and Landis planned the crime two or three months before it was committed and went after Albert to help them "do the job"; said that on the evening the crime was committed he was not living at Landis' house, but that a few days before this crime was committed he had fallen out with Landis and left him and took no part in the crime; that on the evening that the murder was committed he came to Landis' house; that Landis came in at about nine or ten o'clock at night and Albert was there, and Benjamin made some statement as to Landis' bloody clothing and its being washed. He made a statement as to talks between him and Landis the next day, when an account of the crime appeared in the newspapers; that Landis told him and Albert at his house that the descriptions in the newspapers "tallied" with them and that they had better keep off the streets and away from his house; but Wade denied any guilty participation in this crime. He testified that on that night after Landis came in he became sick, or feigned sickness, and that he and Albert went after a doctor; that the doctor came and treated Landis, but that he and Albert went to a fire without. going back to Landis' house. These are some of his statements made before the grand jury. There was no admission that he had any part in or connection with the crime. There was no

full statement of the truth, as had been asked by the prosecuting attorney at the penitentiary; it was an attempt simply to cast suspicion upon Landis; there was no positive evidence of Landis' connection with the crime, but he attempted to exculpate himself. This can not be called "turning state's evidence," as the expression is, under a promise of immunity from the State, which the courts have held should be carried out. He has never testified to the truth of this transaction. He never admitted that he was a witness to the crime or had any active part in it, or gave any positive evidence against Landis as to the commission of this crime except these circumstances to which I have referred. It seems to us that he went before the grand jury voluntarily, under the advice of his own counsel; that every protection was given to him that he could ask; that whether it would be to his advantage or not to go there and make a statement as he did, was a matter for the determination of his own conscience and his own judgment, and was so determined by him with the aid of his counsel.

When this statement made before the grand jury was offered in evidence at the trial, upon objection being made, a preliminary examination was had, in the absence of the jury, to determine the circumstances under which he had made it and whether it was voluntary, and these facts were brought out, and in fact, he himself went on the witness-stand at this preliminary examination—the jury being absent from the room, as stated; and at that preliminary examination, when under oath upon the witness-stand, he testified that his statement before the grand jury was true from end to end. Benjamin Wade never claimed, either on the witness-stand or off the witness-stand, that anything that he said before the grand jury was untrue; that he had been influenced by fear or induced by hope or promises to make one misstatement in the testimony that he gave before the grand jury. So that one of the objections to receiving confessions that are induced by hope or fear, is eliminated here, to-wit, that one, mentioned by Greenleaf, that they are not probably true—for the witness here reiterated the truth of his statement and swore to its truth upon his own trial. It seems to us that it would be a strange doctrine of

law that where a man is charged with murder, if he has voluntarily and of his own motion gone upon the witness-stand before the grand jury and testified as to what he knew about the case, and afterwards, freely, voluntarily and of his own motion again upon the witness-stand at his trial had testified that what he had stated before the grand jury was true and that all this had been done with the knowledge, consent and under the advice of his counsel—it would be a strange doctrine of law to exclude from the jury such a statement when the man was on trial. We think that this statement was properly admitted by the court. Benjamin Wade testified in his own behalf upon the trial to substantially the same effect as before the grand jury. Benjamin also asked for a new trial upon the ground of newly discovered evidence, and filed the affidavit of H. L. Ramsey as to statements made by him to Benjamin in jail in regard to promises made through him by the prosecuting attorney to Benjamin before he went before the grand jury, but this was not newly discovered evidence in any sense of the word.

Benjamin knew all about this, if it ever occurred, at the time of his trial, and was a witness himself and did not mention it. A party can not withhold evidence in this manner at his trial and after verdict against him ask a new trial so that he may offer it at a second trial.

There remains only one question: Whether the evidence proves these men to be guilty of the crime of murder in the first degree? And, after all, that is the question that towers above all other questions in a criminal case. Upon the whole record, the consideration of it from beginning to end, has the defendant had a fair trial? Have his rights been protected? Is he guilty under the evidence and under the law, of the crime with which he is charged? Johanna Sullivan, who was left for dead by the murderers, lived and testified to all the details of this transaction. She and her sister were about to retire, or soon to retire, it being about 7:30 in the evening, and people go to bed early in the country. They were to retire soon after supper; and as a preparation for that, her sister was about to go out to the barn to see whether the live stock was in proper condition to

leave for the night. She went to the kitchen door and as she was about to go out she bid her good night—they seem to have been quite affectionate. Johanna undertook to open the door for Katherine, who was going out with the lantern. She found she was unable, for some reason, to get the door open, and finally Katherine took hold of it and pulled it open. They did not understand why it would not open as it was not locked; and as Katherine pulled it open from the inside, these three men appeared, and one of them, with his sleeves rolled up and a club in his hand pushed himself into the room and began an assault with a club upon Katherine. Another one came in after him and began an assault with a club upon Johanna, and Johanna testifies to this double assault; how her sister closed with one of the assailants and struggled with him near the kitchen stove, and struggled so that he finally called for help and the one who was beating her with a club and had knocked her down went to his aid, and between them they struck Katherine sense-less. She told how they were bound hand and foot and gagged with strips of their table-cloth. She tells how she was struck until they thought she was dead, and one of them asked if she was dead, and the other answered that she was and struck her in the back with his foot and called her a vile name, saying that it was a good thing that she was dead. She states in detail what occurred when both were lying upon the floor ap-parently dead, and she testified that they took off their masks in the kitchen and she saw their faces. This scene seems to have made an impression upon her mind that time did not ob-literate or make dim. She identified positively both of these men as being there in the commission of this crime; she identified both of them before they were brought to trial, when, for the purpose of ascertaining whether she could identify them, she was allowed to see each one of them with others and asked to "pick him out," which she did immediately. She identified them the first time she saw them after the commission of the crime and when she saw them in the court room when they were on trial, when she identified them again. It may be said that she might be mistaken. That is true; but the fact that she identified them outside of the court room and before the trial, when they

were not in custody, and not in chains or handcuffs so there could have been nothing to indicate who the prisoner was, the fact that she identified them then, promptly, is strong evidence that she knew the men—that she was not mistaken. A neighbor woman, a Mrs. Brock, testified that she was near the Sullivan house late in the afternoon or early in the evening of the day of the murder and saw Albert Wade in the vicinity of the house, near a little stream. Benjamin Wade, on divers occasions made statements to different people, especially in jail and when he was a prisoner, that indicated that he had guilty knowledge of this crime—made them to Sheriff Cliff and to Miller, and to prisoners in the county jail—Hageman, Hogan and others—made statements and partial confessions of his connection with and knowledge of this crime. Both Benjamin and Albert Wade made statements showing that Landis was one of those who committed this crime. Landis and Benjamin and Albert were engaged together in a partnership of crime in the city of Toledo just before the murder was committed. Benjamin testifies as to him and Landis riding around the city and in the country for miles in different townships, committing burglaries, stealing horses and other property and bringing it to a house in Toledo, where they lived, to dispose of it. They carried on a large business of this kind months before Albert came. I speak of this to show how intimately they were connected before this murder was committed. Benjamin and Landis had planned this crime long before it was committed, according to Benjamin's evidence, and they concluded that it needed three men and went to Kendallville, Indiana, to get Albert to aid them in the commission of the crime. He came here knowing that he was brought here to take part in the commission of crime— that he actually knew that he was to be engaged in this particular crime is not shown. Benjamin says he did not; but that he was to become a partner in a criminal business he knew, and his wife plead with him not to come. Benjamin testified that Albert came on a stated salary that he was to receive per week for performing his part in the criminal enterprises in which they were engaged. Landis and Benjamin Wade had long lived lives of crime. Benjamin had been twice in the penitentiary; he had

been confined in numerous jails.   Albert had not lived such a life of crime, but had been in the penitentiary, and he came here, as I say, knowing that he was coming to aid in crime —Benjamin says to dispose of their stolen plunder as it was brought in by him and Landis.   He consented to play his part in the commission of this murder after he reached here.   While he may not have struck either of these women, according to his own statement he stood at the door.   He was with the others in the woods when the fatal clubs were prepared with which the murder was committed; he was near the house, according to the testimony of Mrs. Brock, late in the afternoon.   He knew what was to be done; he knew what these clubs were to be used for.   He heard either Benjamin or Landis say as they entered that house: "Your money or your life!" and finally: "Your money and your life!" as Johanna stated.   Although he was not steeped so deeply in crime as were the other two, although his life had not apparently been given over to crime to such an extent as had theirs, yet he was a participant in this crime as well as they, equally liable under the law and before this court.

I have not mentioned all the facts, but enough, and in the face of confession after confession, in the face of positive identification by Johanna Sullivan, in the light of all the surrounding facts and circumstances, it seems to us that the guilt of these men was proved beyond all reasonable doubt; that there is no room for question.   They have no reason to complain of the trial that was given them, they were protected in all their rights, privileges and immunities and were fairly convicted of a murder as cold blooded and diabolical as any that ever stained the pages of the history of this country or of this state—a cruel, deliberate slaughter of a defenseless woman and an attempt to murder another, that they might gain for their reward a few dollars of the earnings and savings of these sisters.

The judgment of the court of common pleas in both cases will be affirmed.

*Frank M. Sala, Frank Mulholland, Brand Whitlock* and *C. M. Milroy,* for plaintiffs in error.

*W. G. Ullery,* Prosecuting Attorney, and *James S. Martin,* Assistant Prosecutor, for defendant in error.