## BERRY *v.* STATE OF INDIANA.

### [No. 23,251. Filed March 4, 1919.]

1. CRIMINAL LAW.—*Appeal.*—*Sufficiency of Evidence.*—To present error on the ground of insufficiency of the evidence, one must show that there is a complete failure of evidence on a material issue. p. 108.

2. CRIMINAL LAW.—*Appeal.*—*Evidence, Weight and Sufficiency.* —*Credibility of Witnesses.*—*Alibi.*—*Verdict.*—The court on appeal will not weigh the evidence as to whether the accused was at the scene of the crime, where there was some evidence of his presence there at the time, since the weight of the evidence and the credibility of witnesses are questions for the jury; and where the jury found against the defendant, and the trial court denied a motion for new trial, the Supreme Court will assume that the court and jury have faithfully discharged their respective duties. p. 109.

3. WITNESSES. — *Contradictory Evidence.* — *Reputation of One Accused by Defendant.*—*Homicide.*—In a prosecution for murder, where the defendant had tried to fix guilt upon another, the state had the right to show that the defendant's story, wherein he accused the other person, was a falsehood, and in so doing could introduce testimony of the reputation for honesty and peacefulness of such person and that he had had no opportunity to commit the crime. p. 110.

4. CRIMINAL LAW.—*Evidence.*—*Witnesses.*—*Credibility.*—Where circumstances, created by the accused or by accident, point to

a third person as guilty, the state may interpose defenses for such person, even though the evidence has a tendency to fortify such person as a witness.  p. 110.

5.  HOMICIDE.—*Weapon.*—*Identification.*—*Weight of Evidence.*— In a prosecution for murder, a hatchet found near the scene of the crime, although not discovered until several months after the offense was committed, was properly exhibited to the jury, where the evidence tended to show that the wounds inflicted on the deceased were such as could have been made by the hatchet; that nobody in the neighborhood had ever had such a hatchet; that it was found in the natural direction for the guilty party to go; that it was in such position that it might be inferred that it was not left there accidentally; and that it appeared to be new, but had a peculiar brown color on the edge; its identity having also been established by witnesses whose testimony traced it from the place of discovery into the hands of the prosecution, since the objection to such exhibit went to the question of the weight of the evidence.  pp. 110, 111.

6.  HOMICIDE.—*Appeal.* — *Harmless Error.* — *Reputation.* — In a prosecution for murder, the admission of testimony as to the defendant's reputation, and particularly that by the defendant's daughter that she, up to the tenth year of her life, knew nothing about her father, if error, was harmless, where there is no showing that any objection was made or exception saved to the admission thereof, and in view of other evidence of a conversation between the defendant and the chief of police, wherein the defendant made the statement, which was not disputed, that he had been in the workhouse for horse stealing.  p. 112.

From Floyd Circuit Court; *John M. Paris,* Judge.

Prosecution by the State of Indiana against Edward Berry.  From a judgment of conviction, the defendant appeals.  *Affirmed.*

*L. A. Douglass, W. Clarke Otte,* for appellant.

*Ele Stansbury,* Attorney-General, *Elmer E. Hastings, Dale F. Stansbury* and *M. Z. Stannard,* for the state.

TOWNSEND, J.—Appellant was convicted of murder in the first degree, and sentenced to life imprisonment.

He claims, first, that the verdict is not sustained by sufficient evidence.

The evidence shows that Mary F. Brookbank, a widow sixty-six years old, had a home in Jeffersonville, Indi-

ana; that she had been in the habit of renting the lower part of this house and had her household goods stored in the upper part; that she was away from home a great deal; that when at home she occupied some of the rooms in the upper part of the house; that in March, 1916, the lower part of the house was unoccupied; that she was at home living alone in the upper part of the house; that she was last seen alive on Wednesday evening, March 29, 1916; that on Sunday, April 2, 1916, her body was found in the lower part of this house; that her head had been cut and crushed by numerous blows inflicted by a sharp instrument similar to a hatchet; that previous to March 29 she had complained to some of her friends that her watch had been stolen; that it was afterwards found that this watch had been pawned on March 28 in Louisville, Kentucky, to one Simon Frocht, a pawnbroker; that on the 4th or 5th day of April, 1916, Mrs. Brookbank's brother, George T. Jacobs, offered $1,000 reward for the apprehension and conviction of the murderer; that, on April 11, appellant asked a Louisville policeman to arrest one Samuel Bottoms, and told this policeman that Bottoms had sold a pawn ticket on Fifth street in Louisville, and that the pawn ticket called for the watch of Mrs. Brookbank, who was murdered in Jeffersonville; that the policeman went with appellant and found Bottoms and took him to a boathouse where the pawn ticket had been sold; that after interviewing Bottoms and calling up the First National Bank of Louisville, to whom Bottoms referred him, Bottoms was released; that on the same day and after appellant had made this effort to have Bottoms arrested, he, appellant, went to one Mike Wall, who was chief of police of the city of Jeffersonville, and said that he knew who committed this murder, and that he wanted to get this $1,000 reward; that he then told Wall that he had seen Bottoms and another man come from the Brookbank

premises, walking very fast, and had seen one of them throw something into a catch-basin of the sewer; that he pursued them, finally lost them; that he again, by chance, ran onto them in Louisville, saw them in front of the pawn shop, saw them with a watch on which was engraved "M. F. J."; that the watch was pawned in Louisville, at the pawn shop before mentioned, for $5; that he saw this engraving on the watch, which was not on the outer lid but on an inner one, while he was standing a few feet away from the man who had the watch in his hand; that afterwards one of the men sold the pawn ticket to a man who kept the motorboat house; that appellant told conflicting stories to the police officers about what was on the pawn ticket, at first claiming that the initials "M. F. J." were thereon, and also how he came to know the initials on the watch, at one time claiming that he saw them on the watch, at another claiming that they were on the pawn ticket, at another that Bottoms had told him the initials on the watch.

The catch-basin in the sewer that appellant told the police about was searched, and papers, documents and keys belonging to Mrs. Brookbank were found. The evidence tended to show that appellant was in the vicinity of the Brookbank home at the time of the supposed stealing of the watch, which was sometime before March 28. The evidence also showed that he was in the vicinity of the Brookbank home on the evening of March 29, which was the night which the evidence tends to show that Mrs. Brookbank was murdered. It was the theory of the state on this evidence that appellant had committed a burglary previous to March 28, and that on March 29 he went back to commit another burglary, was discovered by Mrs. Brookbank, and that appellant murdered Mrs. Brookbank on that occasion; that the papers were thrown into the catch-basin of the sewer by him, and that his story about seeing two men going

hastily from the premises about the time the watch was lost was a mere fabrication, and that he was substituting an unknown man for himself in the course of his flight and his throwing the papers and keys into the catch-basin of the sewer; that after he found that a reward was offered for the murderer, and after the body was discovered, he became anxious to place the indicia of guilt, as to the pawn ticket and watch, on some one else; that on April 11, 1916, he came in contact with one Samuel Bottoms, who was drunk and had been on a protracted spree for several days; that he hung around with Samuel Bottoms in Louisville, and slipped into his pocket a pocketbook containing the pawn ticket in question; that when this pawn ticket was called to Samuel Bottoms' attention he sold it to the man in the motorboat house for twenty-five cents; that appellant then sought a policeman in Louisville to arrest Bottoms, thinking that he had gotten rid of the evidences of guilt and would fix this crime on Bottoms.

The evidence shows that Samuel Bottoms was a man forty-seven years old; that from the 6th or 7th of March, 1916, he was employed by a tobacco broker in Carrollton, Kentucky; that from then on during all of the days of March, and up to and including April 1 until 5 p. m., he was in Carrollton, Kentucky; that during all of this time he boarded at a hotel there and witnesses were constantly in contact with him; that on April 1 he reached Louisville at 9:30 p. m.; that he remained in Louisville at the Capital Hotel that night; that on Sunday, April 2, he was going over books with one Mr. Thompson; that a few days later he got to drinking; that on April 11, 1916, he met for the first time appellant, Berry; that he told Berry he was sick and asked if he knew a place where he could go and sit down and be quiet for a little while; that Berry said he knew a place and would go along with him; that he

told Berry he would buy a drink; that he furnished money to Berry to buy a can of beer; that he (Bottoms) walked out back of the saloon fifteen or twenty feet and looked at the river; that when he looked around Berry was sitting close to him; that he then walked up the street and Berry was around close to him; that he (Bottoms) put his hand in his right outside coat pocket and discovered a pocketbook; that he pulled the pocketbook out and wondered how he came by it; that he himself had a pocketbook but it was an entirely different pocketbook and was in his inside pocket; that he opened this pocketbook which he found in this outside pocket and discovered the pawn ticket; that Berry had said to him previously that he (Berry) had a pawn ticket, or that he was in possession of a pawn ticket, or something of that kind; that Bottoms did not remember whether he exhibited it or not; that when he (Bottoms) found this pawn ticket he went to a boathouse and sold the pawn ticket for a quarter; that the next thing Bottoms discovered, he was awakened by a policeman, who came up and hit him on the foot while he was lying asleep on the girder of a bridge; that the policeman asked him if he had a pawn ticket, or what he had done with the pawn ticket; that he told the policeman that if anything was wrong with the pawn ticket he would take him to the office where he had sold it; that he took the policeman to the office and found the ticket; that thereupon the policeman said, taking hold of his coat: "Where did you get these clothes?"; that he said: "Now here, you do not know who I am. Will you call up some reputable man? Call up Mr. Rose of the First National Bank and ask him who I am"; that the policeman called up Mr. Rose and thereupon released Mr. Bottoms. The evidence shows that while this was going on appellant Berry was present insisting that the policeman arrest Bottoms and insisting that he was the man who had

committed the Brookbank murder, because he had the pawn ticket for Mrs. Brookbank's watch. The evidence further shows in this connection that there was inscribed on an inner lid of this watch, "Pa to M. F. J." The evidence further shows that M. F. J. stands for Mary F. Jacobs, the maiden name of Mrs. Brookbank; that this watch was given to her by her father when she was a girl; this inscription on the inner lid of the watch was such that one who had defective eyesight could not read it. Appellant first claimed that he read this inscription looking over the shoulders of the two men who were standing in front of the pawn shop, one of whom afterwards pawned the watch. But it transpires from the evidence that appellant is a man about sixty-four years old, who cannot read a newspaper without glasses. It also transpires from the evidence that the watch was pawned in the name of Charles Jacobs, and that Charles Jacobs was a son of William S. Jacobs, who in years past had operated a coal yard in Jeffersonville; that appellant had worked in this coal yard when he was a boy and was acquainted with Charles Jacobs; that Charles Jacobs had been dead for a number of years; that appellant knew that Charles Jacobs was dead; that there was no other Charles Jacobs in that vicinity; that Samuel Bottoms did not know the Jacobs family, was not acquainted in Jeffersonville, had not been there for twenty years, until he was on a drunken spree in Louisville, Kentucky, the week following April 2, and was not then in Jeffersonville until Sunday, April 9, when he went over to get a drink in a saloon.

It is incumbent upon the one asserting that a verdict is not sustained by evidence to show that there is a complete failure of evidence on some material 1. issue. The nearest that we can come to finding any specific thing in appellant's brief on which

counsel are basing their claim is that appellant interposed an alibi, and that therefore it was incumbent upon the state to break down this alibi by showing appellant's presence at the scene of the crime. The evidence of the colored janitor at the church, which was in the same block and just back and to the west of the Brookbank property, shows that appellant was in the vicinity on the evening of March 29. Appellant's counsel seem to think that it is for us to weigh this evidence. This we cannot do. The jurors are the best judges of the credibility of witnesses, and when the jury has found a verdict against appellant, and the trial court has overruled a motion for a new trial, we must assume that they have faithfully discharged their respective duties. The verdict is sustained by sufficient evidence.

It is next contended by appellant's counsel that the court erred in permitting the state, as a part of its original case, to prove the general reputation of Samuel Bottoms for peaceableness and honesty in the community where he resided, because counsel say that this is bolstering up a witness before he testifies. The question the state had to meet was: "Did Samuel Bottoms commit the crime?" The theory of the state was that appellant had foisted upon Samuel Bottoms, in his drunken condition, the indicia of guilt, and had woven a tissue of falsehood about him. The evidence in this case tended to show that the appellant placed in Samuel Bottoms' pocket the pawn ticket in question, and it did show and was admitted that on April 11, 1916, appellant called the attention of a Louisville policeman to Samuel Bottoms and insisted on his arresting him because, as appellant said, he had committed the Brookbank murder. It must be remembered that on this very day, April 11, after trying to have Bottoms arrested by a Louisville policeman, appellant told his story to the chief of police

of Jeffersonville, in which he claimed that during the latter part of March he had seen two men (one of whom was Bottoms) hastily leaving the vicinity of the Brookbank house, and had pursued them on foot and interurban, and finally lost them and again came upon them by chance in Louisville. Though the body of Mrs. Brookbank was discovered on April 2, and it was at once generally known in Jeffersonville that she had been murdered, yet appellant disclosed to no one his suspicions and his knowledge until April 11, the very day that Bottoms claims appellant first came in contact with him.

The state had a right to show that appellant's story was false, and, as a part of this falsehood, that he was attempting to fix guilt upon one who had no opportunity to commit the crime, and also upon one whose reputation for peaceableness and honesty was such that he would not do such a thing if he had an opportunity. *Kidwell* v. *State* (1895), 35 Tex. Cr. R. 264, 33 S. W. 342.

Where circumstances, created by the accused or by accident, point to a third person as guilty, the state may interpose defenses for such third person, even though such evidence has a tendency to fortify such third person as a witness. *Bram* v. *United States* (1897), 168 U. S. 532, 568, 18 Sup. Ct. 183, 42 L. Ed. 568.

It is further insisted by appellant that the court erred in admitting in evidence, for the inspection of the jury, a hatchet which was found between two woodsheds on top of some lumber.

These two sheds were on adjoining lots and were only a few inches apart. In between them had been thrown lumber and old scantling that had been lying there for some time. These two sheds were on an alley in the block in which the Brookbank house is located. They were in a direction that one who had committed

the crime would naturally flee. A boy eight years old was playing on the roof of these sheds in the month of July, 1916, and discovered a hatchet lying on this lumber, with the edge down between the boards and the hammer part of the hatchet up. This boy called the attention of his grandfather to the hatchet; the grandfather told him to let it alone, that it belonged to one of the neighbors; that afterwards, on July 11, the boy again called it to the attention of a neighbor woman and she told him to get it, that she had lost a hatchet. He got it and it turned out to be a peculiar hatchet with a short handle and ball-shaped hammer, and ordinary hatchet edge, and, as this witness described it, it had a peculiar brown on the edge; that a part of the hatchet looked bright and new, indicating that it had not been used much; that this hatchet was turned over to a fireman across the street; that he turned it over to the chief of police; that the chief of police identified it as being the hatchet received from the fireman, the fireman identified it as being the hatchet received from the woman; that the woman and the boy identified it as being the hatchet taken from the lumber pile between the sheds.

This was sufficient identification, so far as where the hatchet came from is concerned; but we understand appellant's counsel to contend that, because the murder was committed on March 29, and this hatchet was not discovered until July 11, it is too remote in time, and therefore it was improper to introduce it before the jury. It must be remembered in this connection that it was shown that nobody in the neighborhood had ever had such a hatchet. It must be remembered in this connection that all the persons who testified concerning the wounds inflicted on the head of Mrs. Brookbank testified that they were cuts and crushings of the skull that could have been produced by such

an instrument as this; and it must be remembered that the evidence shows that where this hatchet was found was in the natural direction for one to go who had committed this crime. It must further be remembered that it was in a position on the lumber between these two sheds from which it might be inferred that it was not left there accidentally. Therefore counsel's objection goes to the weight of this evidence rather than to its admissibility. The court committed no error in admitting this evidence.

It is next insisted that the court erred in admitting certain evidence concerning the reputation of appellant in Jeffersonville and vicinity, and particularly in

6. permitting the state to show by a daughter of appellant that she, up to the tenth year of her life, did not know anything about her father.

It is not shown that any objection was made or any exception saved in this behalf. If there was any error here, we think it was harmless.

When appellant had the interview with the chief of police on the afternoon of April 11, that conversation was introduced by the following colloquy:

"Berry: Do you know me?
"Chief: Yes. It is Ed Berry.
"Berry: I would not have known you, Mike.
"Chief: I know you. When did you get out?
"Berry: Where?
"Chief: The penitentiary.
"Berry: I was not in the penitentiary. I was in the workhouse for horse stealing."

Although appellant took the witness stand and disputed some of the evidence given by the chief of police, as to a conservation with this officer on that date, yet the fact in the colloquy above set out stands undisputed, even by appellant. In view of this commentary uttered by appellant on his own character brought down to this time, we feel that, even if there was any error in the

evidence reflecting upon the character and reputation of appellant, it was harmless.

We are convinced that appellant had a fair trial and was properly convicted. The judgment of the trial court is therefore affirmed.

NOTE.—Reported in 122 N. E. 324. Alibi, sufficiency of evidence, 8 Ann. Cas. 1189, 12 Cyc 383. Defendant as witness, credibility, impeachment by proof of other offenses, 105 Am. St. 1005, 12 Cyc 405, 406. See under (6) 12 Cyc 818.