**UNITED STATES of America**

v.

**Michael VEILLEUX.**

**Cr. No. 93–64–01–M.**

United States District Court, D. New Hampshire.

March 15, 1994.

Robert J. Veiga, Concord, NH, for plaintiff.

William S. Harrold, New London, NH, for defendant.

## MEMORANDUM OPINION

McAULIFFE, District Judge.

Defendant Michael Veilleux is charged with possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He moves to suppress certain statements he made while in police custody, as well as physical evidence (the firearm) allegedly derived from those statements. A hearing was held on February 24, 1994. The court issued an order on February 25, 1994, granting defendant's motion to suppress any statements made to law enforcement officers during and following his custodial interrogation, as well as the physical evidence derived from those statements. The court denied defendant's motions to suppress statements he made to third parties while in police custody. This memorandum explains the court's reasoning.

### I. Findings of Fact

During the evening of January 19, 1993, Manchester Police Officer William Davies heard what he believed to be a gunshot as he was turning a corner on routine patrol. He looked in the direction of the sound and saw a man, later identified as the defendant Michael Veilleux, run across the street and into an area of three decker apartment houses. The officer gave chase over roughly a three block area, by car and then on foot. At one point he saw defendant in an alley, near a dumpster, fumbling with his pocket as if to take something out. Veilleux fled when he saw that the officer was in pursuit, and disappeared over a backyard fence. Officer Davies eventually found him a short distance away, lying on the ground next to a vehicle parked at the back of 113 Spruce Street. Veilleux had been drinking heavily and he scuffled with the officer while being arrested. No firearm was found on defendant.

Suspecting that defendant had been in possession of a firearm, Officer Davies and other officers at the scene searched the area near the place of arrest and along the route defendant had taken. The search lasted approximately one hour, but no weapon was found.

The next morning, Veilleux was taken to the Manchester District Court for arraignment on charges of assaulting a police officer and resisting arrest. While in the holding cell at the courthouse Veilleux asked the guard, Manchester Police Officer William Van Mullen, for permission to make a telephone call. Officer Van Mullen took defendant from the holding cell to a public telephone in the hallway nearby. Van Mullen stayed with defendant for obvious security reasons, and watched and heard him call information to obtain the number of the GTE Sylvania company in Manchester. Van Mullen then watched and heard defendant dial the phone and ask to speak to Diane Hanneford, his girlfriend, who worked at GTE Sylvania. Van Mullen overheard the defendant say: "Make a stolen gun report—think about it—was in car glove compartment—in case a kid gets ahold of it."

After he was arraigned, defendant was returned to the holding cell. He engaged in a conversation with one of the other detainees, which also was overheard by Van Mullen. Defendant said: ".32 automatic, I'm glad they did not find it. Was headed from Mike's Pub to British American—has hollow points, too."

Officer Van Mullen called police headquarters and reported what he had overheard to

Detective Sergeant Jeffrey Perschau. Perschau reviewed the investigative reports filed by Officer Davies the night before, and then spoke to Davies about the case. Concerned that a loaded weapon could well be in an area accessible to children and others, Perschau drove to the courthouse where defendant was being detained. Sergeant Perschau had defendant brought to a private office, where they met alone, without counsel present.

Perschau told defendant that he wanted to get the gun off the street before a child found it. Defendant professed ignorance. Perschau persisted, telling defendant that he "wasn't interested in arresting him, [but only] in getting the gun off the street." Transcript, Perschau Testimony.[1] Sergeant Perschau acknowledged, at the hearing, that he in fact had no intention of charging defendant with any crime related to the gun if defendant cooperated. When defendant continued to profess ignorance, Perschau said that since defendant had been through the system many times before, he knew that his statements could be used against him only if Perschau first advised him of his *Miranda* rights, which, Perschau pointed out, he had not done and had no intention of doing. Defendant relented. He told Perschau that since he was not going to be charged, he would help the police find the gun. Defendant then admitted possession, described the pistol, told Sergeant Perschau it was in a black case, and told him he had thrown it on or under a porch during the chase.

Defendant claimed he could not describe the exact location of the pistol, so Perschau took him to the scene in an effort to refresh his memory, where, in defendant's presence, another search was conducted along his route the evening before. Several Manchester police officers assisted in that search. Defendant claimed continued confusion about the exact location of the weapon (due to his drinking, the darkness, and the chase), and

he provided little additional help. The officers searched for about two hours, without success. Defendant was released on bail.

Later that day, when Sergeant Perschau went off duty, he briefed the new watch commander, Lieutenant Stewart, about the matter. Stewart in turn briefed Officer Suckley, who was about to go on duty and was assigned to that area of the city. Officer Suckley also participated in the unsuccessful initial search for the weapon following defendant's arrest. Lieutenant Stewart asked Officer Suckley to search the area again, pointing out that defendant said the gun was thrown on or under a porch. Suckley and his partner drove to the area and began another search.

Under the rear porch at 113 Spruce Street, near the site of defendant's arrest, Officer Suckley discovered the pistol.[2] It was beyond arm's reach, and Suckley was only able to retrieve it by using his police baton to pull it out.[3] Officer Suckley agreed that, consistently with defendant's statement, the pistol obviously had been tossed under the porch.

While Sergeant Perschau did not recall defendant telling him anything about tossing the weapon on or under a porch during the unwarned custodial interrogation, he conceded that Lieutenant Stewart could only have obtained that information from him, and he in turn could only have obtained it from the defendant. Defendant insisted that he did tell Perschau that he threw it on or under a porch. The court finds that during the unwarned custodial interrogation defendant did tell Sergeant Perschau that he threw the firearm on or under a porch, and that Sergeant Perschau relayed that information to Lieutenant Stewart, who passed it on to Officer Suckley. The court also finds that that information substantially affected Officer Suckley's approach to the search, and con-

---

1. The testimony of the witnesses at the suppression hearing has not yet been officially transcribed. The references in this opinion are to an unofficial working copy of the hearing transcript reviewed to confirm the court's memory of the testimonial evidence presented. The official transcript will of course control.

2. The pistol was not in a black case as defendant had described. However, a black case had been taken from defendant upon his arrest and inventoried at the police station the night before.

3. Officer Suckley testified that the distance between the ground and porch floor was about 12 to 18 inches, effectively preventing him from crawling under.

tributed to the successful recovery of the pistol.

Defendant was subsequently indicted on the pending felon in possession of a firearm charge.[4]

## II. The Overheard Conversations

■ Defendant claims Officer Van Mullen intentionally intercepted oral communications he made, in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.* He moves to suppress the contents of both his telephone call to Diane Hanneford and his conversation with another occupant of the holding cell. *See* 18 U.S.C. § 2518(10)(a)(i).

Evidence of those conversations need not be suppressed because they were not "oral communications," which the Act defines as "any oral communication uttered by a person *exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation.*" 18 U.S.C. § 2510(2) (West Supp.1993) (emphasis added). Defendant called Ms. Hanneford using a phone in a public courthouse hallway. He was in custody and under guard by Officer Van Mullen who, for security reasons, was required to remain close by. Defendant had no legitimate or reasonable expectation that his conversation would remain private from any person within hearing distance of the telephone.

Defendant's conversation with his cellmate was also overheard by Officer Van Mullen,

who was standing guard outside the holding cell. The other detainees in the cell, as well as Officer Van Mullen, were within earshot at all times. Defendant could have had no reasonable expectation of privacy under these circumstances either.

■ In any event, Officer Van Mullen did not "intercept" any of defendant's conversations. The Act defines "interception" as "the aural or other acquisition of the contents of any wire, electronic or oral communication *through the use of any electronic, mechanical or other device.*" 18 U.S.C. § 2510(4) (West Supp.1993) (emphasis added). Because Officer Van Mullen used no electronic or mechanical device when he overheard defendant's conversations, there was no interception. *See United States v. McLeod,* 493 F.2d 1186, 1188 (7th Cir.1974).

Defendant's motion to suppress the contents of these two conversations is denied.

## III. The Interrogation

### A. The Quarles Public Safety Exception

■ In general, before a person in custody may be questioned, police must advise that person of his or her rights to counsel and to remain silent. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Absent such advice, any statements made during a custodial interrogation are inadmissible in a subsequent prosecution. *Id.* at 476–77, 86 S.Ct. at 1628–29. In *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Supreme Court cre-

---

4. Defendant does not challenge the prosecution of this case on estoppel grounds, and that issue is neither formally before the court nor has a record been developed sufficient to meaningfully address it. Nevertheless, the court notes that facts developed during the hearing on defendant's suppression motion do evoke ghosts of the once favored "silver platter" doctrine. *See Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), *overruled by, Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). It appears that a Manchester police officer entered into what might be described as a "cooperation agreement," the terms of which were that in exchange for defendant's cooperation in locating the pistol authorities (presumably limited to the state) would not prosecute *any charge related to the pistol.* Here, the federal government, concededly a different sovereign, is prosecuting a case that the state

may well be barred from prosecuting on estoppel grounds. *See United States v. Abou–Saada,* 785 F.2d 1, 6 (1st Cir.) (government's breach of promise not to prosecute may warrant dismissal of indictment or "other appropriate relief"), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986); *United States v. Rodman,* 519 F.2d 1058 (1st Cir.1975) (approving dismissal of indictment when SEC breached agreement to make no prosecution recommendation in exchange for defendant's cooperation); *In re Snoonian,* 502 F.2d 110 (1st Cir.1974) (government's breach of promise not to prosecute would give rise to estoppel) (citing *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971)); *United States v. Carillo,* 709 F.2d 35 (9th Cir.1983) (approving district court's dismissal of indictment where government breached cooperation agreement).

ated a "narrow exception" to that general rule. Under *Quarles,* law enforcement authorities may ask questions "necessary to secure [the police officers'] own safety or the safety of the public," without adhering to *Miranda* requirements. Failure to warn under such circumstances does not affect either the voluntariness or subsequent admissibility of statements made in response to those questions. *Id.* at 658–59, 104 S.Ct. at 2632–33. The Court rejected the argument that all unwarned statements must be presumed involuntary, explicitly holding that questioning intended to eliminate threats to public safety "outweigh[ ] the need for the prophylactic rule protecting the ... privilege against self-incrimination." *Id.* at 657, 104 S.Ct. at 2632. Accordingly, any custodial statements which, but for the failure to warn, are otherwise voluntary may be admitted against the questioned suspect at trial. *Id.* at 654–55, 104 S.Ct. at 2630–31. Evidence discovered as a result of such "voluntary" statements is admissible as well. *Id.* at 659–66, 104 S.Ct. at 2633–2636.

Sergeant Perschau's interrogation was limited to the location of defendant's pistol, and was motivated by genuine concern for public safety. While these facts might relieve any burden imposed by *Miranda* and render both defendant's statements and the pistol admissible, the court finds that the narrow *Quarles* exception is not dispositive here because defendant's statements were otherwise involuntary.[5]

 A custodial statement is involuntary if " 'the will of the defendant ha[s] been overborne so that the statement [is] not his free and voluntary act ... in light of the totality of the circumstances.' " *Bryant v. Vose,* 785 F.2d 364, 367–68 (1st Cir.) (quoting *Procunier v. Atchley,* 400 U.S. 446, 91 S.Ct.

485, 27 L.Ed.2d 524 (1971)), *cert. denied,* 477 U.S. 907, 106 S.Ct. 3281, 91 L.Ed.2d 570 (1986). Factors to be considered in determining voluntariness include the accused's physical and mental capabilities, the conditions of the interrogation, and the conduct of law enforcement officials. *See United States v. Browne,* 891 F.2d 389, 393 (1st Cir.1989); *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (enumerating factors). Where a defendant claims that his admissions were compelled, the government bears the burden of proving voluntariness by a preponderance of the evidence. *United States v. Jackson,* 918 F.2d 236, 241 (1st Cir.1990).

 An involuntary confession may result from psychological, as well as physical, coercion. *See, e.g., Miller v. Fenton,* 796 F.2d 598, 603–04 (3rd Cir.) (citing cases), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). As long ago as 1897, in *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), the Supreme Court held that to be voluntary a confession must not have been " 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence....' " *Id.* at 542–43 (quoting 3 Russell on Crimes 478 (6th ed. 1896)). Although reaffirmed in *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (per curium), and *Brady v. United States,* 397 U.S. 742, 753–54, 90 S.Ct. 1463, 1471–72, 25 L.Ed.2d 747 (1970), the *Bram* test has not been strictly interpreted as a *per se* proscription against every promise made during custodial interrogations, *see, e.g., Miller v. Fenton,* 796 F.2d at 608 (discussing cases), but

---

**5.** Even assuming defendant's statements had been otherwise voluntary, the court seriously doubts that the circumstances of this case would warrant application of the narrow *Quarles* exception. The exception was intended to apply when police, faced with a "kaleidoscopic situation" involving the "immediate necessity" of eliminating a threat to the public or themselves, make an instinctive, on-the-scene decision to ask questions first and advise the suspect later. *Quarles,* 467 U.S. at 656–59, 104 S.Ct. at 2631–33. Thus, where there is an "exigency requiring immediate

action by the officers beyond the normal need expeditiously to solve a serious crime," unwarned statements elicited from a suspect need not be excluded. *Id.* at 659 n. 8, 104 S.Ct. at 2633 n. 8. The intentional refusal to warn a suspect of his constitutional rights, long after his apprehension, arrest, and detention, as happened here, would seem to be a long way from the spontaneous failure to warn prompted by an immediate concern for public safety, as contemplated by the *Quarles* majority.

promises or threats made by police officers are to be considered along with other circumstances in determining whether a defendant's will has been overborne. *Arizona v. Fulminante*, 499 U.S. 279, 284, 111 S.Ct. 1246, 1251, 113 L.Ed.2d 302 (1991); *United States v. Jackson*, 918 F.2d at 242.

■ In this case, Sergeant Perschau's conduct is critical to evaluating the voluntariness of the defendant's statements. This experienced officer did not merely fail to advise defendant of his *Miranda* rights before questioning him. On the contrary, after rational reflection he *intentionally* declined to give the warnings, and so informed defendant, thereby affirmatively misleading him about the scope of his constitutional protection against self-incrimination. He was told, and in fact believed, that no statement he made could be used against him, and that he would not be charged with any crime related to the weapon if he spoke and assisted police. Defendant was in fact induced, by the misrepresentations as to his rights and by the promises of no use and no prosecution, to speak when he otherwise would have remained silent.

Under the totality of these circumstances, defendant's statements were involuntary—his will not to incriminate himself, exercised repeatedly during the interrogation, was overborne by the promises made and distorted legal advice given by Sergeant Perschau. His statements were not his free and voluntary act. Accordingly, his motion to suppress those statements is granted.

B. Admissibility of Derivative Evidence

Defendant also seeks to suppress the pistol, as evidence derived from his involuntary statements to Sergeant Perschau. *See Wong Sun v. United States*, 371 U.S. 471, 485–86, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963). The government argues that the pistol was discovered by Officer Suckley unaided by any information from the defendant and, therefore, is admissible under either the "independent source" or "inevitable discovery" doctrines.

■ "The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 433, 104 S.Ct. 2501, 2504, 81 L.Ed.2d 377 (1984). The government says that Officer Suckley discovered the pistol during a diligent independent search of the area where defendant had been arrested, without benefit of defendant's participation or assistance. The court disagrees, and finds that Officer Suckley's discovery of the pistol cannot be said to be "wholly independent" of the information provided by defendant during his unwarned custodial interrogation.

Defendant testified that he specifically told Sergeant Perschau that he thought he had thrown the pistol on or under a porch. While defendant's credibility is not of the highest order, his testimony was independently corroborated in that this significant information appears in a report written by Officer Suckley, who noted that he obtained the information from Lieutenant Stewart before conducting the successful search. Sergeant Perschau conceded at the hearing that Lieutenant Stewart must have obtained that information from him, and he in turn must have obtained it from defendant. While Sergeant Perschau did not recall defendant telling him anything about throwing the pistol on or under a porch, he was not able to directly contradict defendant.

Officer Suckley, who had also searched the area on the night defendant was arrested, was successful at least in substantial part because he "made a point to check porches" during his second search. He made the point because that is where defendant said he threw it. Thus, the discovery of the pistol was unquestionably tainted by the involuntary statements obtained during the unwarned and coercive custodial interrogation—it was not "wholly independent" of the interrogation.

■ The "inevitable discovery" rule allows admission of tainted evidence that would certainly have been discovered without regard to the unlawful interrogation. *Nix v. Williams*, 467 U.S. at 440–50, 104 S.Ct. at 2507–12. Here, the government has failed to demonstrate by a preponderance of the evidence that discovery of the pistol, without

**156**

benefit of defendant's statements, would have been inevitable. *See United States v. Silvestri*, 787 F.2d 736, 746 (1st Cir.1986), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988). The police conducted a search lasting approximately one hour at the time of defendant's arrest, and a longer, more thorough search the next day. Both were unsuccessful. The pistol was under a porch out of plain view, was partially concealed by snow and trash, and could not be reached by hand.

Discovery of the weapon was "inevitable" only in the sense that because it was susceptible to discovery, in theory someone someday might well find it, either accidentally or through expenditure of sufficient time and resources to cover every possible location.[6] It is equally likely that the pistol would not have been discovered by the police; they had looked under the porch and missed it twice. Absent Lieutenant Stewart's admonition to pay particular attention to porches (based on defendant's statements), they probably would have continued to overlook it, devoting less and less time and energy to the search. The route defendant covered while being chased included approximately three blocks—a large area with a multitude of possible hiding places. In short, the "inevitability" of the pistol's discovery is speculative. The government has offered no "demonstrated historical facts" sufficient to support the conclusion that the weapon would certainly have been discovered by independent, lawful means. *See Nix v. Williams*, 467 U.S. at 445 n. 5, 104 S.Ct. at 2510 n. 5; *see also United States v. Finucan*, 708 F.2d 838 (1st Cir.1983) (mere fact that illegally obtained documents could have been subpoenaed lawfully did not make discovery inevitable).

The pistol is suppressed as evidence derived from involuntary statements obtained in a coercive interrogation.

*IV. Conclusion*

Defendant's motions to suppress are denied as to statements made to Diane Hanneford and to detainees in the holding cell.

Defendant's motion to suppress is granted as to statements made to authorities during and following the unwarned custodial interrogation, and as to the physical evidence (the pistol) derived from those statements.

SO ORDERED.

---

6. The government presented no evidence regarding the police department's intention to devote additional time and resources to the failed search beyond Officer Suckley and his partner's final effort.